CabutheRS, J.,
delivered tbe opinion of the Court.
This bill was filed on 11th of October, 1857, in the Chancery Court of Lincoln county, to rescind a contract of marriage consummated between the parties on the 16th March, 1847, upon the ground of the insanity of the complainant at the time. The Chancellor dismissed the bill upon the facts, and the case is, here by appeal.
At the time of the marriage the comjdainant was about forty-six, and the defendant about fifty-two years-of age. He was a widower with a family of children, and she a widow without children. She had been twice married — first to Thornton, and then to Reddick. Thornton died about the year 1836, a short time after the death of his two children by the complainant, leaving her all his property, consisting of a plantation, twelve or fifteen slaves, &c. She married Reddick in 1840, and after living together a week or two they disagreed, perhaps about her property, and she abandoned him. Each filed their bills for a divorce in the Chancery Court at Huntsville, and in June, 1845, a divorce was granted upon his bill, on the ground of abandonment, and her’s was dismissed. In neither of their bills was any issue made upon her mental condition. She removed to Tennessee, and settled in Lincoln county, in 1844 or 1845, where, she purchased a farm on which she placed her slaves, and other property, and continued to manage the same until her marriage with defendant.
This bill is based upon the allegation, that she was of unsound mind at the time of the marriage, as well as before and afterwards, and a volume of proof was taken, both in Alabama and Tennessee, on both sides, *59 upon tbis question. Tbe contradiction and conflict usual in investigations of tbis bind,' where tbe mind is tbe. subject and opinions are evidence, is to be, found in tbe proof.
Marriage, by our law, is a civil contract, and may be avoided like any other contract, for want of sufficient mental capacity in tbe parties. If tbe mind is unsound at tbe time, it is incapable of consent, and that is an essential element in all contracts.
In tbe dark ages, when there was thought to be something sacred and mysterious in tbe matrimonial relation, and its civil, was almost obliterated by its spiritual character, tbe marriage of persons of unsound mind was held valid. Blackstone, in 2d volume of bis Com.,. 438-9, says, tbis was “a strange determination, since, consent is absolutely requisite to matrimony, and neither idiots or lunatics are capable of consenting to anything.” Tbe test question in all such cases is, whether tbe party is capable of making any binding contract. Tbe identity of tbe doctrine that unsoundness of mind vitiates this, as well as all other contracts, is well established. But every consideration of policy and humanity admonishes us that a contract so essentially connected with the peace and happiness of individuals and families, and the.well-being of society, should not be annulled on this or any other ground, not clearly made out. The consequences, in many cases, would be most deplorable. The rights of property would be unsettled, and the peace of families destroyed, to say nothing about the effects upon the innocent offspring. The annulment of other contracts would only affect property; but this would do that, and more, it would tell upon the happiness, character, and *60 peace of the parties. The appalling character of these consequences are well calculated to impress the Courts with the solemn duty of requiring a clear case for the application of the general principle to this delicate and important contract. It is, however, only a civil contract, and must stand or fall by the usual tests applicable to contracts.
It is not every unsoundness that will avoid a contract. The degree necessary to produce this effect is fixed by the law, and must be made out by proof. All persons of lawful age are presumed to be capable of contracting, until the contrary is made to appear. So sanity is presumed, and if the contrary is alleged, it must be proved by the party imputing it. If a state of permanent insanity is once shown, the burden of proof shifts, and a lucid interval must be proved by the other side. But the rule is different in a case of temporary insanity, depending on some exciting cause not in perpetual action.
The general rule is, “ that those who have not the regular use of their understanding, sufficient to deal with discretion in the common affairs of life, or the weakness being so considerable as to amount to derangement, are incapable of contracting a valid marriage, or making any other binding contract.” Bishop on Mar. and Div., §177.
Sir John Nicholl, in Browning vs. Reane, 2 Phillim., 69; 1 Eng. Ec. R., 190, as cited by Bishop, § 178, says: “ If the incapacity be such that the party is incapable of understanding the nature of the contract itself, and incapable from mental imbecility, to take care of his or her own person and property, such an individual cannot dispose of his or her person and property by *61 the matrimonial contract, any more than by any other contract.”
It is difficult to describe any exact, palpable line between legal capacity and incapacity. Perhaps this is impracticable, as an abstract thing, in reference to the ability to make a valid contract, as insanity subsists in various degrees, and the line of separation between it and mere imbecility, is often faint and imperceptible. The general test, is the fitness of the person to be trusted with the management of himself and his own concerns. Such a person has a disposing, contracting mind, although it may be in a degree impaired.
The proof in this case shows that the complainant has, for a great many years, labored under a disease, called by the doctors prolapsus uteri. This disease, when it becomes chronic, always more or less affects the mind. It may assume such a character as to destroy the intellectual faculties. Such was its effect upon the complainant in 1850, and from that to this time. Previous to 1850, it is very clear from the proof, that she was only subject to paroxysms of the disease, with intervening periods of composure and sanity. There is much detail in the evidence, in relation to her conduct during these paroxysms, commencing in the lifetime of her first husband, and continuing up to- the time of the total derangement of her mind, in 1850. She was the subject of great delusions in the paroxysms of her physical disease; but when these attacks passed off, she was as rational as ever. These changes in her physical system account for the conflict in opinion in relation to her mental condition. Her delusion consisted in ungrounded and startling apprehension of conspiracies against her life by her own slaves, *62 and her kindred, and others. She imagined they were waylaying her house for the purpose of killing her — putting poison in her water, &c. She would prepare herself with pistols and guns on these occasions — shoot them off in the night, and often call for protection. She would become wild and excited, very loquacious, eccentric and foolish, when the fits of this disease were upon her. Much of her conduct on the subject of courtship and beaux, such as showing the love-letters of one suitor to another, and boasting about her conquests, and the like, was in very bad taste, and evinced great eccentricity of character. But if the exceptionable conduct of either widows or widowers, when they become anxious to marry, is to be regarded as delusion-, our lunatic asylum might have to be very much enlarged. Eccentricity of conduct, or peculiarity of manners does not constitute insanity.
It is certainly very clear that this lady • could not be regarded as permanently deranged until 1850. But there is as little question that she was occasionally and temporarily in that condition for ten or twelve years before that time. And the important question is, what was her mental condition at the time of her marriage with the defendant, in 1847 ? There were only two persons present to witness the nuptial ceremony — her overseer, Bethune, and the justice of the peace, Daniel Earrar, who performed the marriage ceremony. The first gave his opinion that she was of unsound mind, and the latter thinks she was perfectly sound and sensible. They both witnessed all her acts and conduct on that occasion, on which they rely for their opinions, and arrive at different conclusions.. The overseer remained in the house but a short time, but the magistrate staid all night, and until *63 after breakfast next morning. He 'states 'that he had a great deal of conversation with her, and never thought of her being insane, but considered her sound and sensible.
It is in proof that .she managed her own business from the death of her first husband, up to the time of the marriage in question; that she contracted with her own overseer; bought land, sold slaves, purchased and made up her negro clothing, and evinced judgment and understanding in all her business transactions. She is proved to have been a neat and excellent house-keeper, both before and after her marriage with Cole. The proof is abundant on these points. The result' of the whole body of the proof is, that she was subject to great mental aberrations when her disease assumed an aggravated form, which was frequent, and when relieved of that, her mind resumed its healthy action again, until the recurrence of 'another paroxysm.
But if the proof established the fact, that she was of unsound mind at the time of the marriage, there is abundant evidence that she was afterwards restored, at least temporarily, and did not repudiate, but her acts and conduct rocognized the validity of her marriage. A lunatic, on regaining his reason, may affirm a marriage celebrated while he was insane. Bishop, § 189; 6 Met., 415; 4 John., ch. 333; and this without any new solemnization. If there is sufficient reason to apply this principle to deeds and other contracts of persons incapable of consent for infancy, there is surely a better and stronger reason to extend it to the contract of marriage.
If the treatment of the complainant by the defendant could have any effect upon the question in this case, *64 as it certainly cannot, it would be found to afford no aid to the bill, as it has been kind and affectionate at all times.
Upon the whole case, we think' the marriage, with all its incidents of rights and duties, was valid and binding on both parties, and affirm the, decree of the Chancellor, dismissing the bill.