Martha Ann Zeliff SIMPSON,
Plaintiff-Appellee,

v.

Robert Wilfred SIMPSON,
Defendant-Appellant.

Supreme Court of Tennessee,
at Nashville.

Sept. 4, 1986.

Rehearing Denied Sept. 22, 1986.

R. Horton Frank, III, Dearborn & Ewing, Nashville, for plaintiff-appellee.

Mary Frances Lyle, Nashville, for defendant-appellant.

## OPINION

FONES, Justice.

Plaintiff's original complaint sought a divorce on the ground of irreconcilable differences but was later amended to assert cruel and inhuman treatment and abandonment and non-support. Defendant filed a pro se answer denying that he had been guilty of cruel and inhuman treatment or abandonment and non-support. The case was tried on 22 May 1984 and 10 September 1984. Defendant was represented by counsel at the trial. Plaintiff's proof consisted of her testimony and the testimony of two corroborating witnesses. Defendant did not testify and the only evidence he presented was the testimony of Dr. Adolph Seigmann in support of his defense of insanity, which the trial judge sustained and dismissed the complaint.

The parties were married 4 March 1973. She was twenty years of age and he was twenty-nine. They were attending a community college in Massachusetts at the time. She went to work so that he could get a degree and the plan was that she would later return to college and obtain her degree. In the intervening years he has attended six different colleges without obtaining a degree and she has had to work throughout their marriage because he has never held a job for more than two or three weeks and apparently has made no effort to obtain employment in recent years. However, he served three years in the Marine Corp prior to marriage and is appar-

ently qualified as an auto mechanic. In 1975 the parties moved to Nashville, where his parents and a brother live.

Plaintiff testified that their trouble began about three months after they were married. She testified that he has repeatedly told her that she was dumb, unattractive, called her a "bitch" and threatened to "push her face in." He constantly criticized her cooking and her housekeeping and said he could not understand how she could hold a job because she was not a good worker. She testified that he frequently called her at work, as many as two and three times a day, to complain about something she had not done at home or had done wrong according to his view or to report that he could not find some object. On one occasion he called her at work and asked if she had taken his checkbook; and receiving a negative response, he demanded that she search her purse. He picked her up after work and immediately searched her purse himself. When they got home, her dresser drawers were "turned over." It was later discovered that he had left his checkbook in his parents' car. Plaintiff testified that these constant calls at work were very disturbing and upsetting to her.

Defendant complained that she did not make enough money to provide him with the things he wanted. In the spring before the separation, although they had no money for such things, he bought equipment for his parents' new boat and charged two to three hundred dollars to accounts that plaintiff was responsible for. On occasion when she would try to talk to him about their problems, he would threaten to "punch [her] face in."

In July 1982, plaintiff's parents paid her plane fare so that she could visit them in El Paso, Texas, during her vacation. When she returned, defendant met her at the plane and "was very quiet and withdrawn." Later that night, after she had gone to bed, he told her that it was unfair that she could go on vacation and he could not. He found some souvenirs that she had bought and threw them around the room and went to the kitchen and ran the garbage disposal for an unusual period of time. Plaintiff went in to investigate and found that he was throwing all of the food in the refrigerator down the garbage disposal. When she asked what was going on, defendant ordered her out of the room.

Plaintiff was afraid to stay in the house with him and called a friend, Carol Schraw, who agreed to pick her up and provide her a place to stay. Plaintiff then called the police. Defendant came into the bedroom and asked if she had called the police. She responded in the affirmative. Defendant immediately headed for the closet where he kept his handguns. Plaintiff ran out of the house and left with Ms. Schraw, who had arrived to pick her up. She resided with Ms. Schraw about ten days. After the plaintiff and defendant had a long talk, defendant promised to control his temper and try to work things out and plaintiff returned to their home.

A few months later, defendant returned to the pattern of abuse described herein. Plaintiff moved out of their home and filed a complaint for divorce on the ground of irreconcilable differences.

Soon thereafter defendant called and asked to take her to lunch to discuss their problems. Plaintiff reluctantly agreed, and defendant picked her up and drove to Bowling Green, Kentucky. After they were on Interstate 65 headed for Kentucky, plaintiff asked where they were going and defendant pulled a handgun from under the seat and showed it to plaintiff. Defendant told plaintiff there was a Bible, writing paper and stamps under the seat and that she should write to her father because he was going to kill her. Plaintiff became ill twice and defendant stopped to allow her to "be sick by the road side." On each occasion defendant warned plaintiff that if she attempted to get away or attract attention, "something drastic would happen." In Bowling Green, defendant allowed plaintiff to go to a restroom in a gas station. When plaintiff came out, he canvassed the restroom to see if she had left a message of distress.

Plaintiff testified that on the trip to Bowling Green defendant made a lot of promises to do better if she would return home and live with him and that she promised to do so only because she felt it was the only way to get back to Nashville. Plaintiff persuaded defendant to take her to the place where she was residing; but first defendant went by their house, gathered up all of his handguns and put them in the car. Defendant told her that he was going to distribute them to the members of his family and that, if he was picked up by the police, he would get out on bail, get access to one of those guns and kill her or a member of her family. Plaintiff testified that she was afraid to live with defendant.

Defendant's acts of cruelty were adequately corroborated by plaintiff's witnesses Patricia Wallenburg and Carol Schraw.

At the conclusion of the hearing on 22 May 1984 defendant moved for a dismissal of plaintiff's complaint on the ground of defendant's insanity and submitted the deposition of Dr. Adolph Seigmann, taken 17 April 1984 for use in evidence and filed 21 May in support of the alleged insanity. The trial judge took the motion under advisement and adjourned the hearing for a later setting. On 27 July the trial judge entered an order denying defendant's motion and setting 10 September 1984 as the date to hear the remainder of the proof.

Doctor Seigmann was the only witness that testified at the second hearing. For some unknown reason, his deposition was not included in the record certified and filed in the Court of Appeals. That Court did not use T.R.A.P. 24(e) to correct the record. This Court entered an order directing the clerk of the trial court to certify and file the deposition with the clerk of this Court, if same had been filed in the trial court. This was done and we have the deposition properly before us. In most cases this circumstance would require that we remand the case to the Court of Appeals to reconsider their decision. However, this is not necessary here. The only material matter in the deposition that was not covered in Dr. Seigmann's testimony on

10 September was his qualifications as an expert witness. The Court of Appeals dispensed with the problem created by a psychiatrist testifying without any proof of his education, training, experience or qualifications by holding that plaintiff's counsel had waived his opportunity to challenge that testimony.

Doctor Seigmann was educated and board certified in psychiatry in Germany in 1953. After three years of research, he immigrated to Canada in 1956 and to the United States in 1960. He practiced in Delaware and Kansas, and at the time of his deposition he had practiced psychiatry in Tennessee for twenty-one years. He was chief of the mental hygiene clinic in the V.A. Hospital at Murfreesboro, when he saw defendant for the first time on 29 August 1983, more than two months after plaintiff filed this suit for divorce. Defendant was treated as an out-patient until 16 January 1984 when Dr. Seigmann had him hospitalized for one week for evaluation.

Doctor Seigmann testified that defendant was suffering from a psychosis known as paranoid schizophrenia, that he had probably been so afflicted since age twenty to twenty-two and that "schizophrenia is never ending." But, he said, defendant would appear to be normal when not under the influence of a "severe episode." His testimony was ambiguous and contradictory on the question of whether defendant had lucid intervals. He appeared to express the opinion that defendant was able to control his behavior and act and appear normal at all times except when he was having a severe episode.

We quote the following testimony of Dr. Seigmann on the effect that paranoid schizophrenia had upon his conduct:

Q. How, in your opinion, to a reasonable degree of medical certainty, does this malady affect his judgment and decision making processes with regard to his behavior toward others?

A. I might have to say something about myself, which you don't mind.

THE COURT: All right.

A. I am now for 40 years and one month in my profession. Today psychiatrists just as soon more talk about how to give medications than to observe patients. I am from the old kind of class. And I'm sensitive to the very touchy and subtle kind of changes in a human's life.

And in this case I would try to make clear to you that this man, besides anhedonia, which means he cannot really enjoy anything himself, has an affliction which is called coarctation. Coarctation.

To explain this, the veteran has not the gift to discuss one subject, the moment he starts to get excited, his thinking processes get so muddled that he talks within one paragraph to absorb seven or eight ideas, making the other superfluous. So although each sentence is perfectly organized, the conglomerate of thinking don't lead to any proper thinking, which means it cannot be developed, he makes himself confused. Anybody who works with him has to sort all of these things out with so-called thinking of a psychiatrist, what does he say, what really does he want to say, and what is really his priority in all of what he says?

Much of his testimony was similarly unresponsive. However, after the completion of the first round of his direct testimony, cross examination and re-direct examination without any significant testimony, defendant's lawyer asked another question, attempting to elicit whether defendant's illness interfered with his ability to "rationally control his actions and behavior." Doctor Seigmann responded, "I think there are times it interferes with it and other times he can't."

The trial judge, dissatisfied with this reply of "sometimes he can" and "sometimes he can't," made an effort to get something more specific from the witness. When such an answer was still not forthcoming, the trial judge explained his problem, as he saw it, to Dr. Seigmann as follows:

EXAMINATION BY THE COURT:

Q. Doctor, you are saying that sometimes he can rationally control his actions?

A. That's right.

Q. Sometimes he cannot?

A. That's right.

Q. So if he does certain, what we would consider or I would consider harmful acts to his wife or whatever, that may be as a result of rational action or it may not be a result of rational action.

In other words, it may be actions he can rationally control or—in other words, what I'm—

A. I'm not aware that he has physically attacked anyone. But he indicated to me he was very angry with his brother.

Q. Brother?

A. Yes. So he went and cut up all the covers of his brother's photos. And the brother was extremely sick and he went, I don't know, to visit the brother. But then again felt he was really rejected because the brother didn't pay attention to him and didn't speak in terms of love. So he is not a cold blooded kind of—

Q. Well, I understand. What I need to know, Doctor, what I need to get to is can he control his actions?

In other words, if, in other words, insanity is a defense to the—in other words, if he does certain acts and he can't be held accountable for those because, in your opinion, he has some mental disorder that would either cause him not to be able to control those acts or would cause him to do those acts of which he is not, let us say, accountable, makes a great legal distinction, a difference.

You see what I'm saying? I'm relating it to insanity as a defense in a criminal case. Insanity is a defense in a divorce action. If this man is not accountable for his acts, then I can't grant his wife a divorce for those acts if he is not accountable for them. I'm trying to put it in as simple terms as I can.

A. Okay. I don't know. Okay. I only know about the episode when he took her to Kentucky, which in some instances, it's not physical but sort of a—I think there will be time, although

hopefully his whole attention will slow down, which at this point we haven't accomplished, he gets extremely furious, as I say, most of the time he obviously ventilates his anger without going into actions.

Additional questions by the trial judge followed without eliciting any clear opinion from Dr. Seigmann regarding the effect of defendant's psychotic condition upon his conduct. Defendant's lawyer then resumed interrogation of Dr. Seigmann and asked the following questions:

Q. And those moments of rage and anger are where he threatens and screams and yells and holds guns on people, in your opinion, to a reasonable degree of medical certainty, can he control his actions at that time?

A. Depends.

Q. What does it depend on?

A. If he has a support system that is not completely cut off and is lonely, he can function somewhat more composed.

Q. Well, suppose he has no support system. Suppose there is nobody, no marriage, no friends.

A. That's right.

Q. In your opinion, can he control himself in those situations of rage?

A. That's why I say psychosis is coming on.

Q. If a crisis is coming on, will he be able to handle that crisis?

A. I don't know.

Thereafter, the trial judge resumed the interrogation and asked two questions to ascertain whether, if the cruel and inhuman treatment complained of by plaintiff consisted of fits of rage and temper tantrums, the defendant would be responsible for these actions. To each question Dr. Seigmann responded, "I don't think so." It appears that the trial judge based his decree on the answers to those two questions when he dismissed plaintiff's complaint, "for lack of statutory grounds . . . owing to insanity of defendant."

The Court of Appeals granted plaintiff a divorce on the grounds of cruel and inhu-

man treatment. In granting that relief, the intermediate court reasoned that mentally ill persons may be held liable in tort if malice or evil intent is not a necessary element. Since the abolition of interspousal immunity in *Davis v. Davis*, 657 S.W.2d 753 (Tenn.1983), "it would be anomalous to hold that a spouse can obtain a recovery in a tort action against a mentally ill spouse but cannot obtain a divorce based upon the same facts." Defendant's abduction of his wife and threats to kill her were tortious acts incompatible with the marital relationship, the court reasoned, and "a spouse's mental illness cannot provide a defense to a complaint for divorce based upon tortious conduct that constitutes cruel and inhuman treatment."

We granted defendant's Rule 11 application expressly to reject tortious conduct as a cause of divorce embraced within the statutory cause of cruel and inhuman treatment or as an independent cause of divorce where a spouse's mental illness would remove the element of volition from the suing spouse's proof of cruel acts.

The Court of Appeals avoided any specific finding of fact with respect to the degree or the character of defendant's insanity or whether insanity had been shown to any degree. The Court of Appeals said that Dr. Seigmann's formal diagnosis of paranoid schizophrenia, anhedonia and coarctation "are of little assistance to this court because their medical significance is not fully explained, and thus, their legal import is unclear." That court concluded its section interpreting Dr. Seigmann's testimony as follows:

According to his psychiatrist, Mr. Simpson is able to rationally control his actions only when he is not having a severe episode. However, when he was having a severe attack he was unable to control his actions. Thus, it was the opinion of the psychiatrist that Mr. Simpson's threats to kill or hurt others for no apparent reason were "related" to his psychotic condition.

Mr. Simpson's psychiatrist expressed no opinion concerning whether his pa-

tient's condition affected his ability to discern right from wrong or whether it affected his capability to intend to do one or the other. He also offered no opinion concerning whether Mr. Simpson had been having a schizophrenic episode during the two incidents of specific conduct described by Mrs. Simpson.

Based upon that interpretation of Dr. Seigmann's testimony, the Court of Appeals could have, and should have rejected the defense of insanity imposed by defendant and granted plaintiff a divorce on the ground of cruel and inhuman treatment.

The Court of Appeals wrote extensively on the subject of the availability of insanity as a defense to a divorce based upon cruel and inhuman treatment. The intermediate court speculated that this Court may have eliminated insanity as a defense to actions for divorce in *Chastain v. Chastain*, 559 S.W.2d 933 (Tenn.1977), where we said, "Both grounds for divorce and defenses against divorce actions are statutory." *Id.* at 934.

In *Quinn v. Quinn*, 169 Tenn. 173, 83 S.W.2d 269 (1935), husband sued wife for divorce on the ground of desertion for two years. Wife had been adjudged insane and the court appointed a guardian ad litem for her. A defense interposed on behalf of wife was that she had been adjudged insane and committed eight months after the alleged desertion period started. In holding that defense negated husband's proof on the statutory charge of desertion, this Court reasoned as follows:

> Obviously defendant, after she became insane, could not entertain the intent and purpose of deserting complainant, or of absenting herself from him. For two whole years after the commencement of the desertion the door of repentance is kept open. At any time within that period the offending party has the undoubted right to put an end to the desertion by returning, or offering to return, in good faith, and resume marital relations. But, for defendant's insanity, she might have decided to return to complainant. Her return, or offer to return, in good faith,

would have broken the continuity of the desertion and complainant's right of action would not have accrued. It cannot be said that she was afforded opportunity to repent and return when her mind was so diseased that she was incapable of forming the intent to return. Her insanity denied to her the full period of grace afforded by the statute. While we have no reported case in this state on the question, it has been held in other jurisdictions that the time during which the defendant has been insane cannot be included in computing the statutory period of desertion. [Citations omitted.]

*Id.* at 175–176; 83 S.W.2d at 270.

In *Cole v. Cole*, 37 Tenn. 57 (1857), the wife, by next friend, sought to annul her marriage to defendant on the ground that at the time of marriage she was insane and incapable of entering into the marriage contract. The parties were married 16 March 1847. There was proof that for many years before the marriage, the wife had had a disease the doctors called prolapsus uteri, which, when it became chronic, could destroy her intellectual faculties. In 1850 the wife's disease reached the chronic stage and permanently affected her. However, the court found that prior to 1850,

> The result of the whole body of the proof is that she was subject to great mental aberrations when her disease assumed an aggravated form, which was frequent, and when relieved of that, her mind resumed its healthy action again, until the recurrence of another paroxysm.

*Id.* at 63.

The legal principles that the Court applied to the issue in *Cole* are found in the two paragraphs that follow:

> It is not every unsoundness that will avoid a contract. The degree necessary to produce this effect is fixed by the law, and must be made out by proof. All persons of lawful age are presumed to be capable of contracting, until the contrary is made to appear. So, sanity is presumed, and if the contrary is alleged, it must be proved by the party imputing it. If a state of permanent insanity is once

shown, the burden of proof shifts, and a lucid interval must be proved by the other side. But the rule is different in a case of temporary insanity, depending on some exciting cause not in perpetual action.

*Id.* at 60.

It is difficult to describe any exact, palpable line between legal capacity and incapacity. Perhaps this is impracticable, as an abstract thing, in reference to the ability to make a valid contract, as insanity subsists in various degrees, and the line of separation between it and mere imbecility is often faint and imperceptible. The general test is the *fitness* of the person to be trusted with the management of himself and his own concerns.

*Id.* at 61.

The courts of our sister states have had considerable difficulty in determining when insanity constitutes a bar to an action for divorce. The cases may be classified generally into two groups. Some courts appear to subscribe to the view that insanity is a good defense to an action for divorce without consideration as to the degree or character of insanity that is relied upon as a defense. The majority of the courts and the better reasoned cases consider the degree and the character of the insanity and what direct effect the degree and character of the insanity has upon the plaintiff's proof adduced to make out the cause of action upon the ground for divorce asserted. *See* Annots., in 19 A.L.R.2d 144 (1951); 42 A.L.R. 1531 (1926); and 4 A.L.R. 1333 (1919).

In *Quinn* and *Cole,* this Court considered the degree and character of the insanity and the direct effect that it had upon the proof of grounds for divorce asserted by the suing spouse.

■ This Court has not decided a case wherein insanity has been asserted as a defense to a divorce action on the ground of cruel and inhuman treatment. We think the rule should be that a defendant in a divorce action asserting insanity as a defense to the commission of acts of cruelty must prove that at the time of such conduct, as a result of mental disease or defect, he or she lacked sufficient capacity either to appreciate the wrongfulness of his or her conduct or the volition to control his or her acts. *See Mikkelsen v. Mikkelsen,* 286 Minn. 520, 174 N.W.2d 241 (1970); *Dorozenko v. Dorozenko,* 6 Mich.App. 336, 149 N.W.2d 202 (1967); and *Schuler v. Schuler,* 290 S.W.2d 192 (Mo.App.1956). This is the civil equivalent of the insanity rule we adopted in *Graham v. State,* 547 S.W.2d 531 (Tenn.1977), applicable to criminal cases. Doctor Seigmann's testimony and other evidence of defendant's conduct over the ten year period of this marriage warrants the conclusion that a typical paranoid schizophrenic has periods of remission and that when in remission his or her actions conform to normal behavior patterns. The defendant in *Forbes v. State,* 559 S.W.2d 318 (Tenn.1977) was a paranoid schizophrenic and the proof in that case led us to the same conclusion. Thus, to successfully defend a divorce action based upon cruel and inhuman treatment, defendant has the burden of proving that he or she was not in remission at the time of the commission of all or a sufficient number of the acts of cruelty relied upon by plaintiff and that plaintiff's proof does not warrant dissolution of the marriage.

The issue of when and in what circumstances insanity is a defense in divorce actions does not depend on whether it is a statutory or non-statutory defense, but upon what direct effect the degree and character of the insanity has upon the proof adduced by the suing spouse as grounds for divorce.

■ The testimony of Dr. Seigmann fails to establish that defendant, as a result of mental illness, lacked capacity to appreciate the wrongfulness of his conduct or the volition to control his actions at the time he committed acts of cruel and inhuman treatment more than sufficient to warrant dissolution of this marriage.

Doctor Seigmann referred several times to the importance of defendant having a

"support system." The answers upon which the trial judge relied in his finding were given by Dr. Seigmann under pressure after having been told by the trial judge what opinion was required to avoid the loss of his patient's "support system." Whatever probative value his opinion might have had, if it had been unambiguous, was destroyed by the trial judge's informing the witness what opinion he would have to express for insanity to constitute a defense to the wife's suit.

The proof was uncontradicted that defendant had inflicted extreme cruelty upon his wife. Beginning three months after the marriage ceremony and continuing for approximately ten years, he had followed a continuing course of abuse and humiliating treatment that consisted of considerably more cruel acts than of fits of rage and temper tantrums. Defendant wholly failed to carry the burden of proving that the many acts of cruelty he committed over that ten year period were committed when, as a result of mental illness, he lacked the capacity to appreciate the wrongfulness of his conduct or the volition to control his actions. Thus plaintiff will be awarded a divorce on the ground of cruel and inhuman treatment.

The proof shows that the parties own a home as tenants by the entirety, that the downpayment of approximately ten thousand dollars was made by defendant; that defendant has contributed nothing or so little to the support of the parties as to be negligible throughout the ten years of marriage; and that not only have the earnings of plaintiff been used to support the parties but also to pay the house notes, taxes and insurance. For the past three years, plaintiff has continued to make all payments necessary to keep and maintain the home, where defendant has lived while plaintiff has had to maintain a separate residence for herself. Plaintiff testified that it has been necessary for her to borrow five hundred dollars per month from her father in order to support a home for defendant and to support herself.

Upon remand the trial court will proceed immediately to order a sale of the house owned by the parties as tenants by the entirety and out of the proceeds thereof pay defendant the exact amount of the down payment and award the balance to plaintiff as her share of marital property and alimony. At the trial plaintiff had two lists of personal property, one that she claimed as hers and the other that she acknowledged belonged to defendant or that she wanted him to have. The trial court is directed to include in the decree the distribution of the personal property in accord with the lists presented at trial by plaintiff.

This cause is remanded to the trial court for the purpose of carrying out the directions contained herein and the entering of a decree awarding plaintiff an absolute divorce on the ground of cruel and inhuman treatment. Costs are adjudged against defendant.

BROCK, C.J., and COOPER, HARBISON and DROWOTA, JJ., concur.

## OPINION ON PETITION TO REHEAR

FONES, Justice.

Defendant, Robert Wilfred Simpson, pro se, has filed a petition to rehear which has been considered by the Court and found to be without merit.

The petition is denied. Costs are adjudged against defendant.

BROCK, C.J., and COOPER, HARBISON and DROWOTA, JJ., concur.