Cordell Andre Montgomery appeals from his conviction for murder, a violation of § 13A-6-2, Ala. Code 1975. Montgomery was sentenced to life in prison. He raises three issues on appeal.
 Facts
During the late afternoon of December 8, 1997, Montgomery walked into the Jefferson County jail and told sheriff's deputy Wendell Smith, "`I need to turn myself in. I just committed a homicide.'" R. 29. Montgomery stated that the victim was a woman named Juanita who goes by the name of Joy; he told the officer that she was at Montgomery's apartment, which was located at 1520 Decatur Avenue. Montgomery stated that he had stabbed Juanita and "that the weapon could be found still in the body of the victim." R. 39. According to Officer Smith, when asked if the police already knew about the murder, Montgomery stated that "he had called a friend of his that worked in a funeral home and asked him to come get the body, because he didn't want any more trouble with the law. He said his friend didn't want to get involved, so he told his friend, `Well go ahead and call the police, then' and he came to turn himself in." R. 30. Smith asked officers of the Birmingham Police Department to investigate. Montgomery stated that "it was a long story" but that he stabbed the victim because she had "been having sex with everybody." R. 39.
The Birmingham Police Department officers entered Montgomery's apartment and found the body of Juanita Jordan Watts facedown in the bathtub. The handle of a knife was protruding from the base of her skull. Ms. Watts had suffered six stab wounds to her head, neck, and back. The cause of death was stab wounds to her neck and back. Subsequently, Montgomery was arrested and was placed on "antipsychotic" medication during his incarceration in the county jail. R. 89.
It was not contested at trial or on appeal that Montgomery killed Ms. Watts by stabbing her with a knife.
 I.
Montgomery contends that he received ineffective assistance of trial counsel. Because this case is reversible for the reasons discussed in Parts II and III of this opinion, the claims concerning ineffective assistance of counsel are moot. We will, however, discuss the preservation aspects of this issue to hopefully aid future newly appointed appellant counsel who seek review of ineffective-assistance-of-trial counsel claims. Montgomery was appointed new counsel to handle postconviction motions and his appeal. Newly appointed counsel filed a motion for a new trial, which, regarding his ineffective assistance of counsel claim, asserted the following: "There was ineffective assistance of trial counsel." C.R. 48. At the hearing on the motion for a new trial, the following transpired.
 "[Sandi Gregory, defense counsel]: Your Honor, I've also alleged ineffective assistance of counsel, and at this time I'm not prepared to argue that particular element of my motion, I'd like to reserve that for appeal purposes, if I may, once I've had a chance to view the transcript.
"THE COURT: Yes, ma'am."
R. 208.
On appeal, Montgomery makes the following specific arguments: 1) that trial counsel failed to move to exclude Montgomery's statement and confession; and 2) *Page 1010 
that trial counsel failed to move for a continuance to reassess Montgomery's competence to stand trial. According to Montgomery, these failures constituted deficient performance, and the deficient performance prejudiced the defense to such an extent that Montgomery was denied a fair trial. The State responds by arguing that Montgomery's specific claims were never presented to the trial court, and that they thus have not been preserved for appellate review.Wilkerson v. State, 686 So.2d 1266, 1269 (Ala.Cr.App. 1996) ("this claim is procedurally barred from appellate review, because it is raised for the first time on appeal"). Montgomery replies that "[a]ppellate counsel could not possibly have known the specific ways in which trial counsel's performance was defective until after [she] had an opportunity to review the transcript on appeal." Appellant's reply brief at page 4.
This situation has been a problem for both attorneys and the appellate courts. In an effort to resolve the problem, the Alabama Supreme Court, in Ex parte Jackson, 598 So.2d 895 (Ala. 1992), implemented a procedure by which newly appointed counsel would have the opportunity to obtain and review a trial transcript before filing a motion for a new trial. Under this procedure, new counsel was expected to raise all claims of ineffective assistance of trial counsel in a motion for a new trial. In Ex parte Ingram,675 So.2d 863, 865-66 (Ala. 1996), however, the Alabama Supreme Court deemed the procedure unworkable and overruled Exparte Jackson, with the following directions:
 "[A]n ineffective-assistance-of-counsel claim must be presented in a new trial motion filed before the 30-day jurisdictional time limit set by Rule 24.1(b), Ala.R.Crim.P., expires, in order for that claim to be properly preserved for review upon direct appeal.
". . . .
 "When a defendant makes a claim of ineffective assistance of trial counsel, and that claim cannot reasonably be presented in a new trial motion filed within the 30 days allowed by Rule 24.1(b), Ala.R.Crim.P., the proper method for presenting that claim for appellate review is to file a Rule 32, Ala.R.Crim.P., petition for post-conviction relief."
Ex parte Ingram, 675 So.2d at 865-66.
In overruling Jackson, the Alabama Supreme Court reverted to the law that existed before the Jackson procedure was implemented — — that is, ineffective assistance of counsel could not be raised for the first time on direct appeal.
 "`"`[C]laims of inadequate representation cannot be determined on direct appeal where such claims were not raised before the . . . [trial] court and there has been no opportunity to develop and include in the record evidence bearing on the merits of the allegations.'"'"
Jackson 598 So.2d at 896 (quoting Dossey v. State, 489 So.2d 662,666 (Ala.Crim.App. 1986), quoting in turn, United States v.Barham, 666 F.2d 521, 524 (11th Cir. 1982)).
Thus, the Alabama Supreme Court has already considered the problem Montgomery raises on appeal and has determined that the better practice is to require that ineffective-assistance-of-trial-counsel claims be first presented to the trial court, even if doing so requires the filing of a Rule 32, Ala.R.Crim.P., petition.
We do note that recently the Alabama Supreme Court, in Exparte Jefferson, 749 So.2d 406 (Ala. 1999), made an exception to the preservation requirement concerning ineffective assistance of counsel. The Jefferson court stated that a general allegation *Page 1011 
of ineffective assistance of counsel raised in a motion for a new trial is "sufficient to preserve the issue for appellate review,"Jefferson, 749 So.2d at 408, "[w]here the record on appeal reflects that trial counsel's performance was so deficient as to fall below an objective standard of reasonableness." Id. InJefferson, after negotiating an agreement with the State, the appellant pleaded guilty to possession of cocaine and was sentenced to 10 years' imprisonment. However, the toxicology report contained in the record revealed that the substance that was the basis of the conviction was not cocaine; in fact, it was not any controlled substance. The Jefferson court stated "[i]t is inconceivable that Jefferson would have pleaded guilty to the charge of possession of cocaine if his counsel had advised him that the substance found was not cocaine." 749 So.2d at 408. Counsel's error in Jefferson was so blatant and clear on the face of the record that there was no room for interpretation. Thus, this preservation exception applies to only a minute number of cases claiming ineffective assistance of counsel on appeal. This Court will not stretch to find ineffective assistance of counsel in cases where the claim has not been addressed by the trial court.
The record from Montgomery's appeal does not reflect on its face that trial counsel's performance was so deficient as to fall below an objective standard of reasonableness. The preservation exception in Jefferson does not apply.
Thus, Montgomery's general assertion that his counsel was ineffective did not preserve the specific claims presented on appeal, Marshall v. State, 629 So.2d 766, 767 (Ala.Crim.App. 1993), and the trial court did not have the authority to preserve the issue for appellate review.
 II.
Montgomery contends that the trial court committed reversible error when it improperly gave a "lucid interval" instruction to the jury. He argues that the prosecution was not entitled to this charge because no evidence was presented tending to establish that the murder occurred during a lucid interval.
At the end of the testimony, during the charge conference, the defense objected to the trial court's giving the State's proposed jury charge on lucid intervals. The trial court ruled that the jury would receive the charge; the defense "excepted" to the court's decision.
The trial court included the following charge in the jury instructions:
 "I also charge you, ladies and gentlemen, where an insane person has lucid intervals, the law presumes the offense of such person to have been committed in a lucid interval unless it appears to have been committed in the time of his distemper."
R. 181. At the end of the instructions, the defense objected to the court's instruction on lucid intervals "as far as the defendant being presumed to have committed the alleged offense during a lucid interval." R. 183. That objection was overruled. The jury requested more instructions on "the law which you're referring to, and . . . what we have to decide based on that law as it's written." R. 184. Regarding lucid intervals, the jury was reinstructed as follows:
 "I also instructed you that where an insane person has lucid intervals the law presumes that the offense of such person had been committed in a lucid interval, unless it appears to have been committed in a time of his distemper. And that goes hand-in-hand with what I instructed you, that every person over 14 *Page 1012 
years of age is presumed by law to be responsible for his acts."
R. 199.
In the instant case William B. Beidleman, a clinical psychologist licensed in Alabama since 1982, and an associate professor of psychiatry at the University of Alabama Medical School in Birmingham, and chief of the outpatient psychiatry program with the Veterans Affairs mental health clinics, testified for Montgomery. He stated that when he met with Montgomery on January 30, 1999, and on February 7, 1999, Montgomery "appeared to be actively suffering from the symptoms of mental illness at the time, schizophrenia."[1] R. 81. In addition to Beidleman's own observations, Beidleman stated that
 "[He] had a box full of records that must have weighed 15 pounds showing that [Montgomery] had been in some type of psychiatric treatment since at least 1975, when he was diagnosed first as psychotic. So [Montgomery] had over 25-year, or, about almost 24-year history of mental health treatment for psychosis and schizophrenia, again, the two most serious disorders."
R. 83.[2]
According to Beidleman, Montgomery was last treated at the Western Mental Health Center, which is an outpatient community mental health center. Beidleman stated that to be eligible for treatment at that facility "you have to be diagnosed with a very serious mental illness." R. 87.[3] Montgomery was supposed to be checked at that facility and obtain the medicine he was prescribed, Risperdal. According to Beidleman, Risperdal is an antipsychotic drug[4] that is better than Haldol, Thorozine, and drugs of that nature. However, Beidleman stated that a drawback to this medication and all medicines of this type was that "once you stop taking it, it doesn't stay in your body long." R. 89. Montgomery's last visit to the center was on October 10, 1997. Thus, according to Beidleman, it would not have taken very long for Montgomery "to get sick" (R. 89) once he stopped taking Risperdal. Beidleman concluded that:
 "In my best professional opinion, at [the time of the murder] Mr. Montgomery was so psychotic that he was unable to realize that what he was doing was wrong; he was unable to control his behavior adequately, and committed a very serious offense as a consequence or a product of this mental illness."
R. 89-90. In addition to Beidleman, two of Montgomery's friends who had known him since college (approximately 24 years before the murder) and his mother testified, in essence, that Montgomery had suffered from a serious mental disease since the 1970s. *Page 1013 
Kimberley Ackerson, a clinical psychologist since February 1995, in private practice in Birmingham, was called as witness by the prosecution to rebut Dr. Beidleman's opinion concerning Montgomery's mental condition. She testified that she interviewed Montgomery at the Jefferson County jail on June 4, 1998. Ackerson testified:
 "This is a, is a rather difficult case because clearly Mr. Montgomery suffers from a serious mental illness, and at the time of the offense there is clear indication that he was, at the very least, experiencing what we call the beginnings of decompensation, meaning he was starting to show symptoms and signs of his mental illness. In particular, he was exhibiting delusions, which are fixed, irrational beliefs that, despite what anyone tells them they can't get rid of, it's a fixed belief, they can't let go of it. And there was also some disorganization of his thinking, and so forth.
 "However, in reviewing all the information available to me, including the information provided by Mr. Montgomery, I felt that he still was very much aware of what he was doing to the victim. And he also, in my opinion, was aware of what the potential consequences, primarily the legal consequences of those actions were.
 "This is based primarily on his actions that he took after the specific offense in question."
". . . .
 "I believe full well that he was aware that [he was killing the victim], that he was doing an act that was going to lead to this woman, or at least he hoped would lead to this woman's death."
R.143-44. The "actions" he took after the offense referred to by Ackerson were as follows:
 "[Montgomery presented] himself to the Jefferson County jail shortly after the alleged offense, admitting the offense, and providing specific details including his address of his apartment, name of victim, and whereabouts of the weapon. From police statements, Mr. Montgomery demonstrated good behavioral control at the time he presented to the jail and he was able to communicate effectively."
C.R. 121.
On cross-examination, Ackerson conceded that Montgomery had been receiving antipsychotic medication for six months while he was in jail before her interview with him. Thus, according to Ackerson, it would be fair to say that Montgomery was not in the same mental condition at that time as he was on December 8, 1997 — the time of the murder. Her report also noted that at the time of the murder, she believed that Montgomery's mental condition was beginning to "decompensate," which means "worsen or become more severe" (R. 150), and that he had failed to report to Western Mental Health Center to obtain his medication during the month of November 1997. Also, Ackerson acknowledged that Montgomery stated to her that he "hadn't been complying with his medication around the time of the alleged offense." R. 151. Ackerson stated in her report that "given [Montgomery's] non-compliance with his medication, he was at risk for experiencing the more disturbing symptoms of his mental illness," and "at the time of the alleged incident that the defendant was experiencing bizarre thoughts consistent with his severe mental illness." R. 151. Her report also reflected that "it was [her] opinion that [Montgomery] displayed severe psychiatric symptoms shortly after being incarcerated." R. 151. Yet, despite these concessions, Ackerson maintained on redirect that, "I believe [Montgomery] knew what *Page 1014 
he was doing, and I believe that his mental illness did not, at that point, substantially impair him to the point that he didn't understand that this would likely have potential legal consequences attached to it." R. 153. On recross, Ackerson was referred to the videotape of a statement Montgomery had given to the Birmingham police shortly after the incident. Ackerson had watched this videotape and recalled Montgomery's stating that he had been thinking about killing the victim for 23 years. Montgomery had known the victim for only a short time. She also recalled from the videotape Montgomery's saying that he had killed the victim because she was trying to kill him, and that his mother had murderous tendencies. These comments are untrue.[5]
Ackerson did not recall Montgomery's saying that he believed his mother had killed his father, or that his father was a federal agent, and that his father's family actually had planned to come to Birmingham to eradicate crime, which are some of the statements on the tape. These statements are also untrue.[6] Though Ackerson stated that she did not recall these specifics, she did "recall that [Montgomery had made] very bizarre statements" on the tape. R. 155.
The prosecution also called Frank Givhan to rebut the defense theory that Montgomery was insane at the time of the offense. Givhan was a friend of the victim's and stated that he saw Montgomery three or four times between Labor Day in September 1997 and the week before her death. He testified that he did not notice any "significant change in [Montgomery's] behavior from the first time that [he] saw [Montgomery] on those three or four occasions between Labor Day and a week before [the victim] died, and the last time that [he] saw [Montgomery]." R. 160.
 "When the law began to notice insanity as a defense, Bracton, Chief Justiciary in the middle of the thirteenth century, define[d] a madman as `one who does not know what he is doing, who lacks in mind and reason and is not far removed from the brutes.' Twenty-five years after Coke quoted Bracton's definition in Beverly's Case, he classified non compos mentis into the [1] born idiot, [2] the madman — one who `wholly loseth his memorie and understanding,' and [3] the lunatic — one who has lucid intervals but is non compos mentis during periods when `he hath not understanding.'"
Young v. State, 14 Md. App. 538, 541, 288 A.2d 198, 200 (Md.App. 1972) (footnote omitted) (emphasis added). Alabama provides:
 "It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."
§ 13A-3-1(a), Ala. Code 1975.[7] Alabama requires "that the defendant must specially plead the defense of insanity" §13A-3-1, *Page 1015 
Ala. Code 1975 (Commentary), and provides that the defendant "has the burden of proving the defense of insanity by clear and convincing evidence." § 13A-3-1(c), Ala. Code 1975.
Caselaw dealing with lucid intervals is typically found in civil law concerning capacity to execute wills or to enter into contracts and conveyances. In Saxon v. Whitaker's Executor,30 Ala. 237 (Ala. 1857) (a case concerning the capacity to execute a will), the Alabama Supreme Court defined lucid intervals as "the clear or calm intermissions of the habitual insanity, — the mere temporary cessations of the malady, — the spaces between the periods of its control and mastery of the mind." (emphasis added). There is no need to distinguish between civil and criminal cases. A lucid interval, as it concerns insanity, is what it is whether in a civil case or a criminal case. Thus, we do not hesitate to cite civil caselaw as authority in this opinion. A lucid interval is still defined as it was in the 1857 Saxon case as "a period during which an insane person enjoys the restoration of his faculties, sufficient to enable him to judge his act." Warren F. Gorman, M.D. Testamentary Capacity in Alzheimer's Disease, 4 Elder L.J. 255, 234 (1996) (footnotes omitted) (emphasis added).
The problem concerning the lucid-interval instruction in the instant case arises because the term "lucid interval" is used in two different circumstances in Alabama criminal cases. First, the law presumes that sanity is "the normal condition of the human mind," Fowler v. Fowler, 292 Ala. 340, 343, 294 So.2d 156, 159
(Ala. 1974); thus it presumes "the accused sane at the time of the crime." Carey v. State, 361 So.2d 1176, 1178 (Ala.Crim.App. 1978). Nor does the law afford the presumption that insanity, once shown, is continuous. Odem v. State, 527 So.2d 1362, 1363
(Ala.Crim.App. 1988) (quoting Lewis v. State, 439 So.2d 1357, 1358
(Ala.Cr.App. 1983). "The rule that insanity once shown is presumed to exist only arises in cases where the insanity is continuing and permanent in its nature, or where the cause of the disorder is continuing and permanent." Carey, 361 So.2d at 1178. "A defendant does not, by evidence that he was `subject to spells of insanity from time to time,' raise a presumption that he was insane when he committed the homicide so as to shift the burden of proving his sanity to the state." Carey, 361 So.2d at 1178. Thus, where a defendant's insanity is not continuing and permanent the law says that that defendant has lucid intervals and that "`where an insane person has "lucid intervals, the law presumes the offense . . . to have been committed in a lucid interval, unless it appears to have been committed in the time of . . . distemper."'"Odom v. State, 527 So.2d 1362, 1363-1364 (Ala.Crim.App. 1988). "[S]anity is presumed, and if the contrary is alleged, it must be proved by the party imputing it." Simpson v. Simpson,716 S.W.2d 27, 32-33 (Tenn. 1986) (citing Cole v. Cole, 37 Tenn. 57
(1857) (insanity preventing entering into a marriage contract). Thus, in these situations, (the "madman" who loses his memory and understanding), the defense has the burden of proving that the offense occurred during an attack of insanity. Bass v. State,585 So.2d 225, 234 (Ala.Crim.App. 1991), overruled on other grounds byTrawick v. State, 698 So.2d 151 (Ala.Crim.App. 1995).[8]
Second, the law permits the defense to prove that insanity is "of a chronic or permanent nature, which on being *Page 1016 
proved is presumed to continue." Bass 585 So.2d at 234. "[I]t is a sound general rule that insanity at any particular time, if shown to be habitual and permanent in its nature, is prima facie presumed as a matter of law to exist at any future time." Odem v. State,174 Ala. 4, 56 So. 913, 915 (Ala. 1911). "If a state of permanent insanity is once shown, the burden of proof shifts, and a lucid interval must be proved by the other side." Simpson, 716 S.W.2d at 32-33[9] Thus, in this situation (a lunatic who had lucid intervals), the defense has met its burden of showing insanity of a permanent nature and the burden then shifts to the State to prove that the offense in fact did occur during a lucid interval — i.e., during a "restoration of his faculties, sufficient to enable him to judge his act." Gorman, 4 Elder L.J. at 234.
In the instant case, there was evidence from both the defense and the prosecution indicating that Montgomery suffered from insanity of a chronic and permanent nature (i.e., Beidleman: Montgomery "appeared to be actively suffering from the symptoms of . . . schizophrenia," "24-year history of . . . the two most serious disorders," "you have to be diagnosed with a very serious mental illness [to be treated at Western Mental Health Center]", "so psychotic that he was unable to realize what he was doing."Ackerson: Montgomery "suffers from a serious mental illness," "non-compliance with his medication . . . [placed Montgomery] at risk for experiencing the more disturbing symptoms of his mentalillness," "at the time of the alleged incident that the defendant was experiencing bizarre thoughts consistent with his severe mental illness"). Nevertheless, the prosecution tried its case based on the theory that Montgomery was sane (the first situation described above) — not on the theory that he was insane but had had a lucid interval during which the killing occurred (the second situation described above). Thus, the State did not present any evidence suggesting that Montgomery was acting during a lucid interval from a chronic mental illness.
The lucid-interval instruction was reversible error for two reasons. First, this theory was not supported by evidence at trial because no evidence was presented indicating that the murder occurred during a lucid interval. "`In determining whether an instruction . . . should have been given, the question is "simply whether such evidence was presented."'" Weaver v. State,678 So.2d 260, 268 (Ala.Crim.App. 1995), rev'd on other grounds,678 So.2d 284 (Ala. 1996) (quoting Williams v. State, 546 So.2d 705,707 (Ala.Crim.App. 1989), quoting in turn Ex parte McGee,383 So.2d 205, 206 (Ala. 1980)). There was no evidence in this case indicating a lucid interval. Second, and equally important, the jury instruction came as a surprise to the defense because there had been no indication before the charge conference that the State sought to pursue this theory; thus, the defense was not given an opportunity to offer evidence in rebuttal. Thus, the giving of the lucid-interval instruction amounted to reversible error. *Page 1017 
 III.
Montgomery contends that the trial court committed reversible error by excluding what he says was relevant and admissible evidence pertaining to his state of mind at the time of the crime.
Montgomery called John Springer II and Marshall Williams as witnesses to testify to Montgomery's state of mind in the fall and early winter of 1997 (September, October, November, and December) — — the months shortly before the murder. Montgomery also called his mother as a witness to testify that Montgomery had failed to take anti-psychotic medication during this time period. Each witness testified that they knew that Montgomery had suffered for a long time with some type of serious mental illness and that during the fall of 1997 they saw Montgomery about once a week. The prosecution objected to Montgomery's attempt to offer, through these witnesses, specific comments Montgomery made in the presence of these witnesses. This evidence was intended to show Montgomery's state of mind during this time period. The State's objections — on the grounds that this testimony, if admitted, would be inadmissible hearsay — were repeatedly sustained by the trial court.
Specifically, the following occurred during the testimony of Mr. Springer:
 "Q. [by Ms. Pearson, defense counsel]: In the fall of `97 did you notice any change in Mr. Montgomery's personality or behavior?
 "A. [Mr. Springer]: Yes. He had started getting more and more out of touch. He would — before that point he would have conversations that were basically logical, and then — even before that point he would say things that were strange, but after that point, maybe during the fall, he would start saying more and more things that were strange.
"Q. Do you recall anything in particular?
 "MR. MAHON [the prosecutor]: Object, may it please the Court. Asking for hearsay testimony.
". . . .
 "MS. PEARSON: Here, again, this is based on whatever statements, just like the police officer came in here and testified as to what statements were made, the deputy came in and testified to what statements were made on December 8. Those were not, some of those were not recorded or videotaped. I'm asking with regards to what statements he may have made to this witness, in his presence.
"THE COURT: Sustain the objection."
R. 116-17.
 "Q. [by Ms. Pearson]: Did Cordell, in the fall of 1997, ever express any fear to you?
 "MR. MAHON: Again, I object. It's apparently the fourth time that there's a request made of this witness for hearsay evidence. I do object.
 "MS. PEARSON: It's not being offered, Your Honor, it's not being offered for the truth of the matter asserted, it's being offered to go to the issue of state of mind.
 "MR. MAHON: This witness is not an expert, and would not be qualified to give an opinion about someone else's state of mind.
 "MS. PEARSON: No, Your Honor, the statement, itself, would be reflective of, for whatever probative value it would offer as to the state of mind, it's just merely reciting this witness has the ability to perceive and narrate and relate back what was said to him.
 "MR. MAHON: Calls for a conclusion on the part of this witness who's not *Page 1018 
been qualified as an expert witness. It is hearsay, Your Honor.
"THE COURT: I understand. I sustain the objection."
R. 117-18.
The following occurred during Mr. Williams's testimony:
 "Q. [by Ms. Pearson, defense counsel]: Did you have one-on-one conversations with [Mr. Montgomery]?
"A. [Mr. Williams]: Occasionally, yes, I did.
"Q. What was the general nature of those conversations?
"MR. MAHON: I object.
 "THE COURT: I'll sustain, as far as going into what was said. As far as describing the nature of the conversation, I would overrule, generally, as to the nature.
 "A. We talked about sports, about school, about jobs, just things in general.
 "Q. During any of these conversations did Cordell ever respond to someone other than yourself?
 "MR. MAHON: Object, may it please the Court, that would call for — other than to answer yes or no, anything that followed after that would be hearsay if it was —
 "THE COURT: Again, I would sustain as to anything specifically said. However, you can answer the question. Did he or did he not?
". . . .
 "Q. During conversations that you had with Cordell, would he make statements in your presence, not directed at you?
 "A. Yes, he did. Yes, he did [and no one else was in the room]."
R. 122-23.
The following occurred during the testimony of Mrs. Ceola Montgomery:
 "Q. [by Ms. Pearson, defense attorney]: Did there come a period of time when there was a change with regard to [Montgomery's] schedule or routine?
 "A. Uh-huh (indicating yes). Yes, it was. In fact, it disturbed me; he didn't come [to see me], and sometimes he wouldn't call.
 "Q. Okay, now, can you give us a time frame as to when you noticed this difference in his behavior?
 "A. Well, after he lost his job, I know that; he was very depressed about that. But before then he sort of stopped coming because I would question him about his medication, and he didn't want to hear it. And —
"Q. When you say he didn't want to hear it, how do you know?
"A. He did not want — he would say that the —
 "MR. MAHON: Object to what was said, may it please the Court.
"THE WITNESS: I beg your pardon?
 "THE COURT: Excuse me, just a second. I'd sustain as to what he said. Go ahead.
 "Q. Did your asking him about his medication seem to bother him?
"A. Yes, he would tell me he —
"MR. MAHON: Object to what —
"MS. PEARSON: You can't say what he told you."
R. 134-35
Defense counsel correctly argued at trial that specific statements made by Montgomery showing his general state of mind in the months preceding the murder were not hearsay and were admissible. The proposed testimony was not hearsay as defined in Rule 801(c), Ala.R.Evid., "because it [was] offered circumstantially to prove state of mind and not to prove the truth of the matter asserted." Charles W. Gamble, Gamble's AlabamaRules of Evidence, § 803(3)(b), (1995). Gamble's goes on to explain that the definitional approach under Rule 801(c), allowing a nondeclarant *Page 1019 
to relay the declarant's out-of-court statements to show the declarant's state of mind is different than the exception to the rule which permits the admission of hearsay statements designated as "state-of-mind" exceptions. Gamble's at 262. Gamble's
explains:
 "the [hearsay exception under Rule 803(3)(b)] applies when the statement directly reflects the declarant's state of mind — e.g., `I plan to kill George'; `I love you' or `I wanted to run over him.' The definitional approach under § 801(c), on the other hand, only circumstantially [implies] state of mind. This latter approach would be illustrated in a will contest case, based upon alleged lack of testamentary capacity, in which the offered statement is that of the testator's having stated: `I am Abraham Lincoln.' This statement, obviously, is not offered to prove the truth of the matter asserted. Rather, it is offered circumstantially as a base from which to infer that the declarant lacked the prerequisite testamentary capacity to execute the will being contested."
Gamble's, § 803 (3)(b). The same situation exists here. Montgomery wanted to show his state of mind leading up to the murder. See, Kernochan v. State, 641 So.2d 1295, 1297
(Ala.Crim.App. 1994) (a case concerning the appellant's alleged "flight" to avoid prosecution wherein this court stated that "what his brother-in-law told the appellant was an out-of-court statement, but it was not being offered to prove the truth of the brother-in-law's statement. Whether the brother-in-law's statement to the appellant was true or not was of no importance. The only importance of the statement was what effect it had on the appellant's state of mind that would cause him to leave the state of Alabama"). We note that "[a]n offer of proof is not necessary to preserve for review the sustaining of a hearsay objection."Kernochan, 641 So.2d at 1297. The testimony that Montgomery attempted to present was not hearsay and it was admissible. "A statement offered for some other purpose other than to prove the truth of its factual assertion is not hearsay." Thomas v. State,408 So.2d 562, 564 (Ala.Crim.App. 1981).
The question is now whether the exclusion of this evidence was harmless to the defense. The State argues that if the exclusion of this proposed testimony was error, which we have determined it to be, it was harmless error, because other testimony was admitted reflecting Montgomery's state of mind in the months preceding the murder and reflecting that Montgomery was not taking his medication near the time of the murder.
We disagree. Here, witnesses gave their personal or professional opinions about Montgomery's mental condition or they recounted their personal observations of his actions or manner. No witness (other than police officers) was allowed to testify to anything Montgomery said. Thus, there was no evidence recounting Montgomery's own expressions of his thought processes, which would circumstantially present his state of mind. Therefore, this evidence would not have been cumulative to other evidence.
 "Furthermore, the proper inquiry here is not whether evidence of the defendant's guilt is overwhelming but, instead, whether a substantial right of the defendant has or probably has been adversely affected. . . . Overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45, Ala.R.App.P."
Lowe v. State, 514 So.2d 1049, 1050 (Ala. 1987). Here, the evidence of guilt was not overwhelming, see Part II.
This was essentially a case of dueling experts. One expert, Montgomery's, opined that Montgomery was so insane he could not be responsible for his actions; another, the prosecution's, opined that *Page 1020 
Montgomery was not insane enough to avoid responsibility for his actions. Not allowing this admissible evidence hampered the defense's efforts to establish its burden of proof — i.e., to persuade the jury that Montgomery was insane at the time of the murder. It goes without saying that evidence concerning Montgomery's state of mind would have been probative on the question of sanity. Moreover, evidence concerning state of mind would have served to corroborate Beidleman's (Montgomery's expert) opinion that Montgomery was insane. Conversely, the evidence could have shed a favorable light on the jury's view of the extent of Montgomery's mental illness, thus detrimentally affecting the weight afforded the prosecution's expert's opinion that Montgomery was not insane to the degree that he should escape punishment for murder.
For the forgoing reasons, set forth in Parts II and III, the judgment in this case is reversed and the case remanded for a new trial.
REVERSED AND REMANDED.
Long, P.J., and McMillan and Fry, JJ., concur. Baschab, J., dissents without opinion.
[1] According to Beidleman, "Schizophrenia is perhaps the most serious disorder that we treat in the mental health field. . . . Schizophrenia is marked by hallucinations and delusion, paranoia, thinking people are out to hurt you." R. 81.
[2] Beidleman stated that psychosis is "really indistinguishable" from schizophrenia,
 "but in 1975 . . . psychiatrists and medical doctors sometimes just put `Psychotic behavior.' Most of us would describe it simply as crazy behavior, irrational behavior, like what you'd think of someone hallucinating, having delusions, thinking the FBI is out to get them, when they're really not.
 "And that term `Psychotic' is not really used very often anymore. `Schizophrenic' is more descriptive of an actual diagnosis." R. 83-84
[3] As a side note, we note that Beidleman also stated that "They've sort of run out of funding, so we're seeing a lot of their patients in my shop." R. 87.
[4] Medication "meant to treat schizophrenia and psychoses." R. 87.
[5] There was no evidence that the victim attempted to kill Montgomery nor was there any evidence that Montgomery's mother had murderous tendencies; in fact she retired after 31 years as a primary school teacher, she has been a Sunday school teacher for 25 or 30 years, she has served over 2500 volunteer hours at Children's Hospital since retirement, and she also participates in various other volunteer work.
[6] Montgomery's father died of a heart attack in 1971; he was employed as a personnel director at a United States Post Office at the time of his death.
[7] Section § 13A-3-1(b) states: "`Severe mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
[8] Trawick changed the level of proof necessary to establish legal insanity from a preponderance of evidence to clear and convincing evidence.
[9] The Saxon court stated that once lunacy was shown by the contestant of the will, it was
 "incumbent on [the proponent of the will] to prove the existence of a lucid interval at the very time the will was executed. For, although it may have existed shortly before the execution of the will, its duration or continuance is too uncertain to be matter of legal presumption. The length of a lucid interval is not a question of law, but a pure question of fact. . . . After the lunacy of the testator has been once established, the mere proof of a[ny] subsequent lucid interval does not shift the burden of proof. . . .[I]t is incumbent the party propounding such will to prove that it was in fact made during such lucid interval."
Saxon, 30 Ala. at 239.