[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 369 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 370 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 371 
The appellant, Lakeisha Shaurelle Finney,[1] was convicted of three counts of trafficking in marijuana, violations of § 13A-12-231(1), Ala. Code 1975 (cases no. CC-98-1688, no. CC-98-1689, and no. CC-98-1691), and one count of trafficking in cocaine, a violation of § 13A-12-231(2), Ala. Code 1975 (case no. CC-98-1690). She was sentenced to 15 years' imprisonment for each conviction; the sentences were split, and she was ordered to serve 3 years in confinement followed by 5 years on probation. The court ordered that the sentences in cases no. CC-98-1688 and no. CC-98-1689 were to run concurrently with each other, and the sentences in cases no. CC-98-1690 and no. CC-98-1691 were to run concurrently with each other and consecutive to the concurrent sentences in cases no. CC-98-1688 and no. CC-98-1689.[2]
The evidence adduced at trial indicated the following. In April 1998, Finney and her husband, Jasper Finney (hereinafter "Jasper") were under investigation for suspected involvement in the Tuscaloosa drug trade. Agent Michael Acker of the Tuscaloosa Police Department, who was assigned to the West Alabama narcotics squad, used a confidential informant, Gregory Kulp, to purchase narcotics from the Finneys. Kulp, who had purchased about two pounds of marijuana per week from Jasper during the previous six months, had agreed to help Agent Acker in exchange for dropping pending possession-of-marijuana charges against him. Kulp normally set up his transactions with the Finneys by telephoning Jasper on Jasper's cellular telephone to arrange a time for the transaction. He would then go to the Finneys' residence, where he would give money to Finney and pick up the narcotics. On occasion, he would place his order directly with Finney, rather than with Jasper.
On April 14, 1998, under Agent Acker's supervision, Kulp telephoned Jasper and requested three pounds of marijuana. Kulp was "wired," given $2,700 in marked bills, searched, and instructed to go to the Finney residence to buy the marijuana. Agent Acker followed Kulp to the residence and stopped at the driveway, while Kulp continued up to the house. Finney answered the door and let Kulp inside. The marijuana was sitting on a table, and Kulp handed Finney the $2,700 (giving rise to the trafficking charge in case no. CC-98-1691). Kulp then asked Finney if she could get him some soft powder cocaine, and she said that she would check into it. Kulp left the house and put the marijuana in his trunk. He then drove to the police station, where Agent Acker took the *Page 372 
marijuana out of the trunk. Subsequent testing showed that the substance was, in fact, 2.87 pounds of marijuana.
On April 20, 1998, Kulp arranged another transaction in the same manner as the first one. He was again "wired," given marked money, and instructed to go to the Finney residence. When he arrived, Jasper let him inside. Jasper told Kulp that he had been unable to obtain the powder cocaine that Kulp had asked for previously. Kulp then handed the money to Finney, who counted it and placed it on the table. Finney then retrieved the marijuana from a pantry in the kitchen and gave it to Kulp (giving rise to the trafficking charge in case no. CC-98-1688). Kulp then left with the marijuana, put the marijuana in the trunk of his car, and drove to a nearby church where officers were waiting to seize the marijuana. Subsequent testing revealed that the substance was, in fact, 2.91 pounds of marijuana.
Following the second transaction, the agents executed a search warrant at the Finney residence. As agents pulled into the Finneys' driveway, Finney was backing out in a white Jaguar automobile. When Finney saw the police, she began blowing the horn. Agents arrested Finney and searched the car, where they found a shopping bag containing what subsequent testing revealed to be 2.5 pounds of marijuana (giving rise to the trafficking charge in case no. 98-1689) and electronic scales. As Finney was attempting to back out of the driveway, agents saw Jasper run out of the rear of the residence. He was apprehended in the backyard and was also arrested. During the search of the residence, agents found, among other things, the following: the marked money used by Kulp to purchase marijuana a few minutes before; a plastic bag in the kitchen containing what was later determined to be 341.63 grams of cocaine (giving rise to the trafficking charge in case no. CC-98-1690); electronic scales; a "stash can" in the kitchen containing a false bottom, under which was a small amount of marijuana; a small bag of cocaine in a coffee can in the master bedroom; and over $500 in currency at various places in the residence.
After her arrest, Finney was advised of her Miranda[3] rights, and she gave a statement to Agent Acker. Finney told Agent Acker that the marijuana and cocaine were obtained from two black males in Birmingham and that she and her husband normally obtained 50 pounds of marijuana at a time from those individuals. She admitted to having approximately three pounds of marijuana in her car, and stated that she was leaving the residence because she had heard the police helicopter overhead.
At trial, however, Finney denied dealing in narcotics. She also stated that she did not know that Jasper was dealing narcotics, but that she suspected he was. She admitted to giving Kulp a green bag on April 14, 1998, but she claimed that she did so only because her husband had instructed her to and that she did not know what was in the bag, although she suspected that it was marijuana. Finney also testified, in contrast to her statement to police, that she left the house on April 20, 1998, not because she heard the police helicopter, but because her husband had told her to and that she did not know that a bag of marijuana was in her car.
 I.
Finney contends that the trial court erred in denying her motion to dismiss the indictment in case no. CC-98-1691 because, she says, count 1 of the indictment is "so devoid of basic essential information that it cannot be said to have *Page 373 
charged an offense." (Issue IV in Finney's appellate brief at p. 44.) Specifically, Finney alleges that count 1 of the indictment fails to state an offense because both the date of the offense and her name are omitted from that count of the indictment.
The indictment in CC-98-1691 was titled "The State of Alabama vs. Lakeshia Shalnelle Finney alias Lakeshia S. Finney, Lakeshia Finney, Lakeshia Ball"[4] and charged Finney in three counts with trafficking in marijuana, distribution of marijuana, and possession of marijuana. Both the date of the offense and Finney's name were omitted from count 1 of the indictment (the trafficking charge). The date and her name were included in counts 2 and 3 of the indictment, although those counts were dismissed on the State's motion on the first day of trial. The body of the indictment charged:
"COUNT 1
 "The Grand Jury of said County charge that before the finding of this Indictment, [blank space], did unlawfully and knowingly possess a controlled substance, to-wit: Cannabis, in a quantity in excess of one (1) kilo or 2.2 pounds, but less than 100 pounds, in violation of Section 13A-12-231 of the Code of Alabama.
"COUNT 2
 "The Grand Jury of said County charge that before the finding of this Indictment, LAKESHIA SHALNELLE FINNEY, alias LAKESHIA S. FINNEY, alias LAKESHIA FINNEY, alias LAKESHIA BALL, whose name is otherwise unknown to the Grand Jury, did on, to-wit: April 13, 1998, unlawfully sell, furnish, or give away, manufacture, deliver, or distribute a controlled substance, to-wit: Marijuana, in violation of Section 13A-12-211 of the Code of Alabama.
"COUNT 3
 "The Grand Jury of said County charge that before the finding of this Indictment, LAKESHIA SHALNELLE FINNEY, alias LAKESHIA S. FINNEY, alias LAKESHIA FINNEY, alias LAKESHIA BALL, whose name is otherwise unknown to the Grand Jury, did on, to-wit: April 13, 1998, unlawfully possess marijuana for other than her own personal use, in violation of Section 13A-12-213
of the Code of Alabama."
(C. 449-50.)
The record reflects that Finney filed her motion to dismiss the indictment on the first day of trial. In her motion, she alleged that the indictment did not apprise her of the charges against which she was expected to defend because, she said, count 1 of the indictment did not state the date the offense occurred or any specific facts of the offense. After hearing arguments from both parties, the trial court denied the motion, finding that count 1 of the indictment sufficiently apprised Finney of the charge against her. Finney never argued to the trial court that the indictment failed to state an offense because her name was omitted from count 1.
Rule 15.2(a), Ala.R.Crim.P., provides that "[o]bjections based on defects in the commencement of the proceeding or in the charge, other than lack of subject matter jurisdiction or failure to charge an offense, may be raised only by pretrial motion as provided in Rule 15.3." Rule 15.3(a)(1), Ala.R.Crim.P., provides that motions "under Rule 15.2 must be made . . . [i]n the circuit court, at or before arraignment or by such later date as may be set by the court." Thus, only if the omissions of the *Page 374 
date of the offense and Finney's name from the indictment rendered the indictment void for failing to charge an offense or deprived the trial court of subject-matter jurisdiction — the only defects in an indictment that can be raised at any time — can we review Finney's arguments.
Rule 13.2(d), Ala.R.Crim.P., provides, in pertinent part, that "[i]t is not necessary to state the precise time or date at which or on which the offense is alleged to have been committed, or the place where the offense is alleged to have been committed unless the time or place is a material element of the offense." The date of the offense is not a material element of the offense of trafficking in marijuana; therefore, the date did not have to be alleged in the indictment. Because the date of the offense did not have to be alleged in the indictment, its omission did not render the indictment void for failing to charge an offense nor did it deprive the trial court of subject matter jurisdiction. Thus, Finney's challenge to the indictment for not alleging the date of the offense was waived by her failure to raise the claim at or before arraignment.
The same is true of the omission of Finney's name from count 1 of the indictment. Although we have found no Alabama cases directly on point with respect to this issue, we have found three cases from other jurisdictions with similar situations. In all three of those cases, the omission of the accused's name from the body of the charging instrument was found not to be fatal. See State v. Nixon, 977 S.W.2d 119, 121
(Tenn.Crim.App. 1997) (noting that the defendants had waived their challenge to the indictment because "[t]he omission of the defendants' names in the body of the indictment neither relates to subject matter jurisdiction nor failure to allege an offense," but nevertheless holding that "[s]ince the defendants were named on the cover sheet . . . it is clear that they were the persons referred to in the body of the indictment"); State v. Geary, 884 S.W.2d 41, 44 (Mo.Ct.App. 1994) (holding that failure of indictment to include the defendant's name was not fatal because the original complaint that initiated the prosecution properly listed the defendant's name and "[t]he record indicate[d] that [the] defendant . . . knew what he was charged with and what facts the charge was based upon"); and Hill v. State, 523 P.2d 1114, 1116 (Okla. Cr. 1974) (holding that information was not fatally defective because "while defendant's name did not appear in the charging part of the information, it did clearly appear in the caption and in the verification of the charge by the District Attorney").
Rule 13.2(a), Ala.R.Crim.P., provides, in pertinent part, that "[t]he indictment or information shall be a plain, concise statement of the charge in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment." Section 15-8-28, Ala. Code 1975, provides, in pertinent part, that "[t]he indictment must be certain as to the person charged." However, it is well settled that "the sufficiency of a criminal indictment is determined from its `face' and within `the four corners' of the indictment." Hunt v. State, 642 So.2d 999, 1026 (Ala.Crim.App. 1993), aff'd, 642 So.2d 1060 (Ala. 1994).
 "The indictment must contain the elements of the offense intended to be charged and sufficiently appraise the defendant of what he must be prepared to meet. Reading the indictment as a whole, the accused should receive sufficient information to enable him to reasonably understand not only the nature *Page 375 
of the offense but the particular act . . . which he must be prepared with his proof."
Chambers v. State, 364 So.2d 416, 419 (Ala.Crim.App. 1978) (emphasis added).
In this case, count 1 of the indictment properly charged the offense of trafficking in marijuana, as set out in § 13A-12-231(1), Ala. Code 1975, and Finney's name was in the title of the indictment and also in counts 2 and 3 of the indictment. Although through what was obviously a clerical error her name was omitted from count 1 of the indictment, it is clear from the whole of the indictment that Finney was the person charged with trafficking in marijuana in count 1 of the indictment. Therefore, the omission of Finney's name from count 1 did not render the indictment void for failing to charge an offense nor did it deprive the trial court of subject-matter jurisdiction. Accordingly, Finney's claim in this regard does not fall within either of the two exceptions in Rule 15.2, and she has waived review of this claim by not raising it at or before her arraignment.
 II.
Finney also contends that the trial court erred in denying her motion made pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), because, she says, the prosecutor struck the only three black veniremembers solely on the basis of their race. (Issue I in Finney's appellate brief.)
After the jury had been struck, Finney's counsel made a Batson motion; in that motion he argued that the prosecutor had struck the only three blacks who were on the venire, and that, in his opinion, there was no reason revealed during voir dire for one of those strikes, specifically the strike against juror M.W. The trial court found that Finney had established a prima facie case of discrimination and requested that the prosecutor give his reasons for the three strikes. The prosecutor then gave the following reasons:
 Juror M.W.: "Number [132], which was [M.W.] The reasons we struck her, among others, were there was a vehicle at the [Finneys'] residence that we were concerned that somebody in [M.W.'s] family owned. That's one reason. Another reason is she said the district attorney's office was unfair to someone close to her or something to that effect. But it was definitely that the district attorney's office was unfair to them. And that coupled with some other things that were lesser but still there which were things that people she knew who stayed with abusive people because of their children.[5] And I'm anticipating that's what [Finney's counsel] — I don't know how that's a defense, but I'm assuming that's what is being proffered out there. If nothing else, it was her saying that my office had been unfair to someone close to her." (R. 79-80.)
 Juror R.B.: "[R.B.] was the one that said it was a double standard to use a confidential informant or to use a little fish to catch a bigger fish. . . ." (R. 83.)
 Juror E.C.: "[R.B.], who was the other African-American that the State struck, was talking about the double standard — about there being a double standard with the use of confidential informants and things of that nature. When he did that, I was standing right there, and [E.C.] perked up and started nodding and said yeah. So that was as much a response to [R.B.'s] comments as *Page 376 
anything else. In addition to that, because I believe this case is going to have a lot to do with the use of informants and a lot to do with the informant trying to get something off of his record, I think she would be influenced in that way. The other comments she made about knowing about abusive relationships and people who have stayed in them for various reasons." (R. 80.)
The trial court then asked the prosecutor if he struck all jurors who had indicated that they knew something about abusive relationships. The prosecutor replied that he had struck all except one, whom he said he did not strike because she had indicated that "she sees how drugs and everything affects children. That will be part of this case when it happened in front of [a] child." (R. 81.) The trial court found that the prosecutor had provided race-neutral reasons for striking jurors M.W. and R.B., but expressed reservations about the strike of juror E.C., and asked Finney's counsel if he had any response "as to whether or not [the prosecutor] struck the other folks who said something about they knew of domestic violence." (R. 83.) Finney's counsel replied the State had not struck one female juror who had indicated that her brother and his first wife had had a "bad relationship." (R. 83.) The trial court then asked if either party had anything to add regarding the motion. The prosecutor then reiterated that one of the reasons he had struck E.C. was because she had, in addition to indicating that she knew one or more persons in abusive relationships, also nodded her head and agreed with R.B.'s statement during voir dire that there was a "double standard" in the use of confidential informants. (R. 84.) The trial court found this statement to be a race-neutral reason for striking E.C. and denied Finney's Batson
motion.
Initially, we note that although the voir dire examination is transcribed in the record and the trial court stated for the record the names of the jurors who were selected to sit on the jury, the record does not contain the jury strike list or the master jury list, and the actual striking of the jury is not transcribed in the record. Thus, nothing in the record indicates the race of any of the prospective jurors and we cannot determine from the record which jurors were struck by the State and which jurors were struck by the defense. As we stated in Johnson v.State, 823 So.2d 1 (Ala.Crim.App. 2001):
 "Initially, we note that the record does not contain any documents that show the race of the prospective jurors on the venire or of the members of the jury itself. The jury strike list is not in the record, nor is the striking of the jury included in the trial transcript. . . . Other than defense counsel's assertions in support of the Batson motion, there is simply no evidence in the record of the race of prospective jurors on the venire, of which prospective jurors were struck by the State and which were struck by the defense, or even of the identity or race of the jurors who ultimately sat on Johnson's jury. `It is the appellant's duty to provide this Court with a complete record on appeal.' Knight v. State, 621 So.2d 394, 395 (Ala.Crim.App. 1993). `"Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done."' Owens v. State, 597 So.2d 734, 736
(Ala.Crim.App. 1992), quoting Jolly v. State, 405 So.2d 76, 77 (Ala.Crim.App. 1981). `This court will not presume error from a silent record.' Frazier v. State, 758 So.2d 577, 600 (Ala.Crim.App.), aff'd, 758 So.2d 611 (Ala. 1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66 (2000). See *Page 377 
also Roberts v. State, 627 So.2d 1114, 1116
(Ala.Crim.App. 1993)."
823 So.2d at 18-19.
However, because neither the prosecutor nor the trial court disputed the assertion by Finney's counsel that the prosecutor struck the only three blacks on the venire, and because the trial court expressly found a prima facie case of discrimination, we examine the prosecutor's reasons for his strikes based on the limited record before us.
 "`The party alleging racially discriminatory use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987). Once a prima facie case has been established, a presumption is created that the peremptory challenges were used to discriminate against black jurors. Id. at 623. Where the prosecutor is required to explain his peremptory strikes, he or she must offer "`a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. However, this showing need not rise to the level of a challenge for cause.'" McLeod v. State, 581 So.2d 1144, 1155 (Ala.Crim.App. 1990), quoting Ex parte Branch, 526 So.2d at 623. (Emphasis in Branch; citation omitted.) Once the responding party has articulated a race-neutral reason or explanation for eliminating the challenged jurors, the moving party can offer evidence showing that the reason or explanation is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is "clearly erroneous." Id. at 625.'
 "Burgess v. State, 811 So.2d 557, 572-73 (Ala.Cr.App. 1998), aff'd in pertinent part, rev'd on other grounds, 811 So.2d 617 (Ala. 2000).
 "`Within the context of Batson, a "race-neutral" explanation "means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. . . . In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. . . . [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within the trial judges's province.'"'
 "Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App. 1994) (emphasis added; citations omitted)."
Rogers v. State, 819 So.2d 643, 648-49 (Ala.Crim.App. 2001).
We conclude, as did the trial court, that the prosecutor's stated reasons for striking jurors M.W., R.B., and E.C. were facially race-neutral. The prosecutor stated that he struck juror M.W. because (1) he believed that one of the vehicles at the Finneys' residence was owned by someone in M.W.'s family; (2) M.W. indicated during voir dire that the district attorney's office had been unfair to someone who was close to her and who had been charged with a crime; and (3) M.W. indicated during voir dire that she knew someone who had stayed in an abusive *Page 378 
relationship because of children, which the record reflects was an aspect of Finney's "defense" at trial. "Peremptory strikes of jurors because they have relatives who have been prosecuted by the district attorney's office are not racially discriminatory. . . . The district attorney's prosecution of a member of a veniremember's family is a race-neutral reason for a peremptory strike." Spratt v. State, 833 So.2d 662, 664
(Ala.Crim.App. 2001). In addition, the fact that a member of M.W.'s family may have, in fact, had a connection to Finney was also a race-neutral reason for striking her.
The prosecutor stated that he struck juror R.B. because he indicated during voir dire that he believed the use of informants in order to secure an arrest was a "double standard." The prosecutor stated that he struck juror E.C. because she had nodded her head and said "yeah" in response to R.B.'s opinion regarding the use of informants and because she had indicated during voir dire that she had known people who had stayed in abusive relationships for various reasons. Given that a large portion of the State's case was the testimony of Kulp, an informant who had agreed to help the police conduct controlled purchases of narcotics from the Finneys in order to have pending drug charges against him dropped, we conclude that striking jurors R.B. and E.C. because they indicated that they held negative opinions of informants was also facially race-neutral. In addition, given that Finney alleged at trial that her husband was abusive and that she stayed with him only because of the children, the prosecutor's stated reason for striking jurors M.W. and E.C. — i.e., that they had indicated they knew someone who had stayed in an abusive relationship — was also facially race-neutral.
Once the prosecutor articulated race-neutral reasons for striking those three jurors, the burden then shifted to Finney to show that the reasons given by the prosecutor were merely a sham or pretext. Finney made no attempt at trial to show that the prosecutor's reasons were pretextual, nor did she even make that allegation. However, on appeal, she makes several arguments as to why the prosecutor's reasons were pretextual. Assuming that Finney's arguments on appeal can even be considered by this Court, given that they were never presented to the trial court, we find that they do not establish that the prosecutor's stated reasons for his strikes were pretextual.
Finney argues that one of the prosecutor's stated reasons for striking juror M.W. — that M.W. indicated during voir dire that the district attorney's office had been unfair to someone close to her who had been charged with a crime — was pretextual because M.W. also stated during voir dire that despite the unfair treatment to the person, she could be fair and impartial. In response to the prosecutor's question whether any prospective juror had "a friend or relative who's — or somebody close to them who's been arrested and accused of some kind of criminal conduct," the following occurred:
"[Prosecutor]: Yes, ma'am. Somebody close to you?
"[M.W.]: Yes, sir.
"[Prosecutor]: Was it a drug kind of thing or violence?
"[M.W.]: Violence.
 "[Prosecutor]: Okay. Do you think they were treated fairly?
"[M.W.]: No, I didn't.
 "[Prosecutor]: Okay. Specifically do you think the police treated them fairly?
"[M.W.]: Uh-huh, yes.
 "[Prosecutor]: Do you think — I'm assuming the district attorney's office was involved with this at some point. *Page 379 
"[M.W.]: (Nods head.)
 "[Prosecutor]: Do you think we treated him fairly or whoever was here at that time?
"[M.W.]: No.
". . . .
 "[Prosecutor]: Would you be able to put whatever feelings you have about all that aside and not hold that against myself in this case?
"[M.W.]: Yes.
"[Prosecutor]: Listen to the witnesses and the evidence?
"[M.W.]: Uh-huh."
(R. 40-43.)
Although M.W. stated that she could put aside her feelings regarding the unfair treatment she believed someone close to her received from the district attorney's office, we find it reasonable for the prosecutor to question whether she could, in fact, do so. The record reflects that three other jurors indicated during voir dire that a relative or someone close to them had been accused of criminal conduct. Those three jurors each stated that they believed their relatives and/or friends had been treated fairly, and two of those jurors indicated that they could be fair and impartial. However, one of the jurors indicated that, despite the fact that her relative and/or friend was treated fairly, she believed that the experience would affect her if she sat as a juror and that she could not be impartial. None of the three jurors who indicated that they knew someone who had been accused of a crime sat on Finney's jury. As noted above, Finney failed to provide this Court with a complete record on appeal; therefore, we do not know whether those jurors were struck by the State or by Finney. However, based on the record before us, we simply cannot say that the prosecutor's stated reason for removing M.W. was pretextual.
Finney also argues that the prosecutor's stated reason for striking R.B. — that he indicated during voir dire that he believed the use of informants by the police in order to secure an arrest created a "double standard" — was also pretextual because, she says, the prosecutor did not do sufficient follow-up questioning to determine that R.B. would be biased against the State because of his opinion on the use of informants by the police. The record reflects the following during voir dire:
 "[Prosecutor]: . . . Does anybody on the panel believe it's unjust, unfair or wrong for law enforcement to use what's called an informant or snitch or confidential informant? . . . Does anybody think that when law enforcement uses an informant, which there is going to be in this case, which you will hear evidence about, that instead of them getting in trouble for something, they turn over their supplier. Would anybody — do you think that's unfair? Yes, sir, Mr. [R.B.]?
 "[R.B.]: . . . I believe it's probably a double standard. I do have a problem with that. You know, people undercover or whatever entrapping folks, trying to get them to do this so they can —
 "[Prosecutor]: If there isn't any evidence of entrapment and all it is is somebody who's an informant to use a small fish to catch a bigger fish, is that okay with you?
"[R.B.]: Say that again?
 "[Prosecutor]: I guess an analogy is what I'm using. If you're using a smaller fish to catch a bigger fish, is that okay with you?
"[R.B.]: I don't know."
(R. 48-49). R.B. specifically stated that he "had a problem" with informants not getting into trouble for something they did merely because they turned over their supplier to police, and he suggested that *Page 380 
he believed the use of such informants constituted entrapment by the police. When the prosecutor tried to question him further about whether, under the specific circumstances of this case, he would still have the same opinion, R.B. stated "I don't know." Contrary to Finney's contention, there was sufficient questioning of R.B. for the prosecutor reasonably to conclude that R.B. may not be receptive to what amounted to the majority of the State's case against Finney — the testimony of an informant. Therefore, we cannot say that this reason given by the prosecutor was pretextual.
Finney also argues that one of the prosecutor's stated reasons for striking E.C. — because she had nodded her head and said "yeah" in response to R.B.'s opinion regarding the use of confidential informants — was pretextual because, she says, a court cannot find a reason to be race-neutral and not pretextual when "not a single word from the juror themselves on the subject that led to the strike is found in the transcript." (Finney's appellate brief at p. 25.) The prosecutor stated that E.C. nodded her head and said "yeah" in response to R.B.'s opinion about confidential informants. Finney did not object or otherwise contradict this assertion at trial. See generally Rogers, supra (finding that prosecutor's stated reasons for striking juror were not pretextual and noting that although the juror's demeanor — one of the prosecutor's reasons for striking the juror — was not reflected in the record, the appellant did not object or otherwise disagree that the juror's demeanor was as the prosecutor stated). Therefore, we cannot say, based solely on Finney's bare assertions made for the first time on appeal, that the prosecutor's reason was pretextual.
Finally, Finney argues that the prosecutor's explanation that he struck jurors M.W. and E.C. because they knew someone who had been in an abusive relationship was merely pretextual because, Finney says, the prosecutor did not strike white jurors who had also indicated that they knew people in abusive relationships. We agree with the trial court that this reason given by the prosecutor is highly suspect based on the voir dire examination. The record reflects that three jurors who actually sat on Finney's jury gave similar answers regarding knowing someone in an abusive relationship. However, this was not the only reason given by the prosecutor for striking jurors M.W. and E.C.; the prosecutor also articulated other clearly race-neutral reasons. This is not a situation where the prosecutor indicated that he was striking jurors M.W. and E.C. solely because they had indicated that they knew someone in an abusive relationship and only after the trial court expressed concern as to the propriety of that reason came up with another reason that was not so suspect. Rather, the prosecutor gave two reasons for striking M.W. and one reason for striking E.C. before even mentioning the fact that they had known someone in an abusive relationship. Under these circumstances, we cannot say that the fact that one of the prosecutor's reasons is highly suspect automatically renders the prosecutor's other reasons pretextual.
Based on the limited record before us, we cannot say that the trial court's denial of Finney's Batson motion was clearly erroneous.
 III.
Finney also contends that during his rebuttal closing argument the prosecutor improperly argued facts not in evidence. (Issue III in Finney's appellate brief.)
The record reflects the following during the prosecutor's rebuttal closing argument: *Page 381 
 "[Prosecutor]: If y'all remember Tuesday, I stood up here in front of y'all and I told you what I was going to show y'all.
 "I told y'all that to meet our burden I was going to show y'all that on April 14, 1998, the defendant sitting right over there had more than [2.2] pounds of marijuana. That's what I told y'all. Well, I did one better. I brought it in here. Not only did she have it, she sold it. That's gravy. But she had it. She sure had it when she handed it to Mr. Kulp. When she took his money for it, she sure had it.
 "On April 20, 1998. I told y'all I was going to show you the defendant had more than [2.2] pounds of marijuana. That's the second buy. State's five. Again, did one better. Didn't just show she had it, ladies and gentlemen; showed she got it from the cabinet and gave it to Greg Kulp. She took the money, put it on the table.
 "Told y'all, ladies and gentlemen, on Tuesday I was going to show you that on April 20, 1998, the defendant had more than [2.2] pounds of marijuana. Kind of repetitive. But ladies and gentlemen, again, do you one better.
 "Had it in the car with her. She couldn't smell it. She couldn't smell it in the car. Y'all [are] in this big old courtroom and I bet y'all smell it. But she couldn't smell it in the car. But y'all are supposed to believe her. She knew it was in there. Jasper just told her to run, so she ran. And she goes out there ladies and gentlemen, and she is sitting in her car. And the police are coming in and the helicopter that doesn't really bother her hovering right over her house — wouldn't that bother anybody? But the helicopter right over her house, she runs out and gets in her car, starts tearing down the driveway, [that] came from the stand. That's evidence that came from the stand. What did she think to do? Blow my horn. Why did you do that, Ms. Finney? Just blew my horn. Why did she do it?
 "Number four. I think I told you April 20 the defendant had in excess of [28] grams of cocaine. Had to get rid of that cocaine. The wolves are at the door, ladies and gentlemen. We got to get rid of that cocaine. Blow the horn, go flush it, go do something.
 "[Finney's counsel]: Judge, I'm going to object. This is a mischaracterization of the testimony. That's not what was said, Your Honor.
"THE COURT: The jury heard the testimony.
"[Finney's counsel]: Mischaracterization.
 "[Prosecutor]: Thirty-eight thousand dollars. Unbelievable. You also heard the more you cut it up, the more it's worth. What do y'all think those little baggies are for?
 "Ladies and gentlemen y'all heard how much this stuff is worth. How much danger do you think her family was in having this at their house? Her children. You hear her child walk by [on] the tape and say, hey mama. That's on the tape. Some of this is on the table. What happens to a child if they eat this? But kids don't do things like that, do they? Kids don't go back there and mess with guns that are on the floor.
 "But no, ladies and gentlemen. She is the real victim. Not those kids. She is a good mother. And if you don't believe me, ladies and gentlemen, listen to that first tape to the first buy. Listen to that child walk in in the middle of a drug deal. That's a nightmare on that tape. She is guilty. *Page 382 
 "No, ladies and gentlemen, the police lied to you because they are on my side. If my side is preventing this, that's fine.
 "You will hear that the presumption of innocence is a piece of evidence that you take back there. You use common sense and all that, all the evidence you heard. Another piece of evidence I want to talk about. I'm not going to go over all the witnesses. But there is one more piece of evidence I want to talk about, something that came from the witness stand from two officers. And that's something that this defendant said out there when she got busted. This is what she said after she was read her Miranda warnings, right to remain silent and all that stuff you hear on TV. We get the marijuana and cocaine back from two black males in Birmingham that go —
 "[Finney's counsel]: Judge, again this is a mischaracterization of the testimony. That was not the testimony as came out in this courtroom and I strongly object to that, Your Honor. He knows that's wrong.
 "THE COURT: The jury, you heard the evidence in the case and you are to decide what the true facts in the case are. And whatever the lawyers say to you is not evidence.
 "[Prosecutor]: Thank you. Two black males in Birmingham that go and pick it up in California. Jasper and I are usually fronted [50] pounds of marijuana at a time. I was moving the marijuana because I saw the police chopper. There are probably three to four pounds of marijuana in the car. That's what she told Agent Acker. That's what she told Agent Owens then.
 "But it's all Jasper, right? What about `we'? What about `Jasper and I'? What happened, I was moving the marijuana. I. There's probably three to four pounds of marijuana in the car. But, wait, she didn't know about that, right?
 "Ladies and gentlemen, this case is not about Jasper Finney. This case is about Lakeisha Finney. And this is about her losing a lifestyle she has come to enjoy. You know, having to choose between a Jaguar, a Lexus, and a Suburban [vehicles]. That's tough. And it's hard to let that go. Because, believe it or not, this stinking mess on the railing in front of y'all is worth a fortune on the street. That's what she didn't want to lose.
 "Ladies and gentlemen, the evidence in this case is overwhelming. When you go back there and use your common sense and apply it to this, you'll find her guilty. Thank you.
 "THE COURT: Ladies and gentlemen, you have heard all the evidence and the closing arguments of the counsel. Now it becomes my duty to give you the charge. However, because we are close to our break and it may take us a few moments to do the charge, we're going to take a break for about [10] minutes and we'll try to resume at [10] o'clock for your charge.
 "(The jury was dismissed for the recess and the following occurred outside their presence:)
 "[Finney's counsel]: Judge, again I move for a mistrial at this point. [Prosecutor's] mischaracterization of the testimony during the State's closing and also there was — and at least in my opinion the motion in limine that I filed before this trial started about sending a message to the community, there was somewhat of a mention of that. And that was — as I understood the Court's ruling, that was precluded from trial. So, based on that I would move for a mistrial. *Page 383 
"THE COURT: Okay. The Court will deny the motion."
(R. 333-39.) (Emphasis on portions of closing argument Finney complains of.)
As the above-quoted portion of the record clearly shows, Finney's claims regarding the emphasized portions of the prosecutor's rebuttal closing argument were not properly preserved for review. Finney objected to only two of the five portions of the argument she now complains about, and she did not receive adverse rulings on either of those objections. See, e.g., Harris v. State, 745 So.2d 940 (Ala.Crim.App. 1999) (holding that a defendant must receive an adverse ruling on an objection to the prosecutor's closing argument in order to preserve the issue for review); and Click v. State, 695 So.2d 209, 231 (Ala.Crim.App. 1996) ("When no objection is made following a prosecutor's allegedly objectionable remark, a claim of error based upon improper argument of counsel is not preserved for appellate review."). Moreover, Finney's motion for a mistrial, made after the State had concluded its rebuttal argument was not timely and thus did not preserve her claims for review. See, e.g., Wilson v. State, 651 So.2d 1119, 1122 (Ala.Crim.App. 1994) (a motion for a mistrial "is untimely if it is not made until the conclusion of the witness's testimony or counsel's argument").
However, even assuming that her claims were properly before this Court for review, we conclude, after reviewing the record as a whole, that all of the prosecutor's remarks were either proper inferences from the evidence or replies-in-kind to Finney's closing argument. Therefore, we find no error in the prosecutor's rebuttal closing argument.
 IV.
Finally, Finney contends that the trial court erred in denying her motion for a new trial on the ground that she was denied the effective assistance of trial counsel. (Issue II in Finney's appellate brief.)
The record reflects that Finney was sentenced on April 14, 2000. On April 24, 2000, Kathleen Morris filed a notice of appearance on behalf of Finney. On April 26, 2000, Finney's trial counsel, Milton Brown, filed a motion to withdraw, which the trial court granted on April 28, 2000. On May 10, 2000, Morris filed a motion for a new trial on Finney's behalf in which she alleged, among other things, that "[t]he performance of trial counsel was ineffective, in violation of defendant's Sixth Amendment rights, in failing to enter objection, in failing to file certain motions, in failing to conduct a proper pretrial investigation, and in other relevant matters relating to the proceedings before this Court." (C. 99.) That same day, Morris also filed a motion to suspend the time for setting an evidentiary hearing on the motion for a new trial until 30 days after a transcript of the trial had been prepared for purposes of appeal. On May 24, 2000, the trial court granted the motion to suspend the time for an evidentiary hearing. However, on June 9, 2000, the trial court rescinded its order granting the motion to suspend time on the ground that no transcript would be prepared because Finney had not filed a notice of appeal, and setting a hearing on the motion for a new trial for June 29, 2000. On June 13, 2000, Finney filed a motion requesting that the trial court reconsider its June 9 order rescinding its previous order suspending the time for an evidentiary hearing on the motion for a new trial. It does not appear that the trial court ever ruled on that motion. However, that same day, June 13, 2000, the trial court reset the hearing on the motion for a new trial to August 14, 2000. *Page 384 
On July 17, 2000, Finney filed a motion to continue the hearing on the motion for a new trial, which the trial court granted on August 1, 2000. The hearing was rescheduled for September 7, 2000. On September 1, 2000, Finney filed another motion to continue the hearing on the motion for a new trial. This motion was granted on September 5, 2000, and the hearing was rescheduled for December 4, 2000. On September 19, 2000, the trial court again rescheduled the hearing, this time for December 12, 2000. A hearing was finally held on Finney's motion for a new trial on December 12, 2000, after which the trial court denied the motion.
Rule 24.4, Ala.R.Crim.P., provides:
 "No motion for new trial or motion in arrest of judgment shall remain pending in the trial court for more than sixty (60) days after the pronouncement of sentence, except as provided in this section. A failure by the trial court to rule on such a motion within the sixty (60) days allowed by this section shall constitute a denial of the motion as of the sixtieth day; provided, however, that with the express consent of the prosecutor and the defendant or the defendant's attorney, which consent shall appear in the record, the motion may be carried past the sixtieth day to a date certain; if not ruled upon by the trial court as of the date to which the motion is continued, the motion is deemed denied as of that date, unless it has been continued again as provided in this section. The motion may be continued from time to time as provided in this section."
The trial court's initial scheduling of the hearing for June 29, 2000, and the numerous subsequent continuances of the hearing were not in compliance with Rule 24.4. The record does not reflect that the prosecutor consented to the initial setting of the hearing or to any of the continuances, and both the initial setting of the hearing outside of the 60-day time limit in Rule 24.4 and two of the subsequent continuances were made unilaterally by the trial court without even Finney's consent. Therefore, Finney's motion for a new trial was denied by operation of law on June 13, 2000, 60 days after she was sentenced.
Moreover, because Rule 24.4 was not complied with, the trial court did not have jurisdiction to conduct the December 12, 2000, hearing on Finney's motion for a new trial, and the trial court's denial of that motion the same day was "`a nullity and . . . of no force and effect.'"Edgar v. State, 646 So.2d 681, 683 (Ala.Crim.App. 1993), rev'd,646 So.2d 683 (Ala. 1994) (pertinent reasoning approved), quoting Box v.Box, 536 So.2d 83 (Ala.Civ.App. 1988). See also Similton v. State,672 So.2d 1363 (Ala.Crim.App. 1995). Furthermore, "[a]ny testimony given at the . . . hearing likewise is of no consequence and cannot be considered by this court." Edgar, 646 So.2d at 683.
Because we cannot consider any evidence presented at the hearing on the motion for a new trial, the only document properly before this Court for consideration is Finney's motion for a new trial. That motion, however, was neither verified nor supported by affidavits. In addition, as noted above, Finney's only claim in the motion was that "[t]he performance of trial counsel was ineffective, in violation of defendant's Sixth Amendment rights, in failing to enter objection, in failing to file certain motions, in failing to conduct a proper pretrial investigation, and in other relevant matters relating to the proceedings before this Court." (C. 99.) Finney did not identify in her motion what objections she believed her trial counsel should have made, what motions she believed her trial counsel should have filed, how her trial counsel's pretrial *Page 385 
investigation was deficient, or how her trial counsel's performance was deficient in "other relevant matters."
 "`"Assertions of counsel in an unverified motion for a new trial are bare allegations and cannot be considered as evidence or proof of the facts alleged."' Ingram v. State, 629 So.2d 800, 804
(Ala.Cr.App. 1993) (quoting Smith v. State, 364 So.2d 1, 14 (Ala.Cr.App. 1978)). Accord Arnold v. State, 601 So.2d 145, 154 (Ala.Cr.App. 1992); see also Similton v. State, 672 So.2d 1363 (Ala.Cr.App. 1995). `There is no error in a trial court's denial of a motion for new trial where no evidence is offered in support of that motion.' Arnold, 601 So.2d at 154. Furthermore, although the state did not answer the allegations in the motion for a new trial and although the motion was denied by operation of law, since the motion for a new trial is not supported by an affidavit or any other evidence and the grounds relied on in the motion are not shown by the record, `it is unnecessary for this court to reverse and remand this case to the trial court for a hearing on the appellant's allegations . . . contained in the motion for new trial.' Similton, supra, 672 So.2d at 1366; see Hill v. State, 675 So.2d 484 (Ala.Cr.App. 1995). The denial of the motion for a new trial is due to be upheld."
Smith v. State, 675 So.2d 100, 101 (Ala.Crim.App. 1995). See also Rogersv. State, 819 So.2d 643 (Ala.Crim.App. 2001). Because Finney's motion was unverified and was not supported by any affidavits and because her claims of ineffective assistance of trial counsel were so general in nature that we cannot say they were shown by the record, we find no error in the denial of Finney's motion for a new trial by operation of law.
Moreover, we note that, on appeal, Finney raises seven specific claims of ineffective assistance of trial counsel, as compared to the three general claims in her motion for a new trial. Specifically, she alleges that her trial counsel was ineffective for: (1) not calling her husband to testify on her behalf; (2) not challenging the indictments as multiplicitous; (3) not objecting to the trial court's order consolidating the four cases for trial; (4) not objecting to the admission of the marijuana evidence purchased by Kulp on the ground that the State failed to prove the chain of custody of the marijuana; (5) not requesting before trial that the State provide notice of any Rule 404(b), Ala.R.Evid., evidence it intended to offer at trial and then not objecting to the admission of that evidence when it was offered at trial; (6) not objecting to the prosecutor's alleged leading of its witnesses on direct examination; and (7) not moving to suppress the evidence found in her residence on the ground that it was the product of an illegal warrantless search.
None of the specific claims that Finney raises on appeal were included in her motion for a new trial.[6] However, to the extent that Finney's claims in her motion for a new trial can be considered "general" claims so as to raise the possibility that they would be sufficient to preserve for review the more specific claims raised on appeal, we have reviewed the record and find no ground for reversing Finney's convictions. As this Court noted in Roberson v. State, [Ms. CR-00-2405, June 28, 2002] ___ So.2d ___ (Ala.Crim.App. 2002): *Page 386 
 "In Ex parte Jefferson, 749 So.2d 406 (Ala. 1999), the Alabama Supreme Court created an exception to the preservation requirement when a defendant asserts a claim alleging ineffective assistance of counsel. The Court held that a general claim of ineffective assistance of counsel may be sufficient to preserve for appellate review a more specific claim of ineffective assistance of counsel `[w]here the record on appeal reflects that trial counsel's performance was so deficient as to fall below an objective standard of reasonableness.' 749 So.2d at 408. In Montgomery v. State, 781 So.2d 1007 (Ala.Crim.App. 2000), this Court recognized that the exception carved out by the Alabama Supreme Court in Jefferson would be applicable in `only a minute number of cases' — those cases where counsel's error is `so blatant and clear on the face of the record that there [is] no room for interpretation.' 781 So.2d at 1011. We held in Montgomery that we would `not stretch to find ineffective assistance of counsel in cases where the claim has not been addressed by the trial court,' and that if the record on appeal does not reflect on its face that counsel's performance was so deficient as to fall below an objective standard of reasonableness, the preservation exception carved out in Jefferson
would not apply. Id.
 "In this case, we find that Roberson's four claims of ineffective assistance of counsel, which were not presented to the trial court in his motion for a new trial, do not fall within the preservation exception of Jefferson. The record does not reflect, on its face, that counsel's performance at the suppression hearing was so deficient as to fall below an objective standard of reasonableness. Therefore, those claims are not properly preserved for review. See, e.g., Flowers v. State, 799 So.2d 966 (Ala.Crim.App. 1999); and Montgomery, supra."
___ So.2d at ___ (footnote omitted). Similarly, here, the seven specific claims of ineffective assistance of trial counsel Finney raises on appeal do not fall within the preservation exception of Jefferson because the record does not reflect, on its face, that the performance of Finney's trial counsel was so deficient as to fall below an objective standard of reasonableness. Therefore, Finney's seven specific claims of ineffective assistance of counsel were not properly preserved for review.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB aND Wise, JJ., concur. BASCHAB, J., concurs in the result.
[1] Finney's first and middle names are spelled several different ways in the record. In this opinion, we use the spelling Finney uses in her appellate brief.
[2] This Court dismissed Finney's original appeal as untimely. She then filed a Rule 32, Ala.R.Crim.P., petition, contending that her failure to file a timely appeal was through no fault of her own. See Rule 32.1(f), Ala.R.Crim.P. The trial court granted her an out-of-time appeal. All citations to the record in this opinion are to the record from Finney's original appeal.
[3] Miranda v. Arizona, 384 U.S. 436 (1966).
[4] See note 1.
[5] One of Finney's defenses at trial appeared to be that she engaged in the criminal activity because Jasper forced her to and she had remained in what she said was an abusive relationship with Jasper because of her children.
[6] Although it appears that some of those claims were argued to the trial court at the hearing on the motion for a new trial, as noted above, the trial court did not have jurisdiction to hold that hearing; therefore, we cannot consider anything that transpired during it.